[Crim. No. 6146.    First Dist., Div. Four.    Mar. 27, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. EUGENE REX
FITZWATER, Defendant and Appellant.

Al Matthews for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Horace Wheatley, Deputy Attorneys General, for Plaintiff and Respondent.

RATTIGAN, J.—Count I of an information charged that appellant conspired with Paul Van de Bogart to violate Health and Safety Code, sections 11530 (possession of marijuana), 11500 (possession of peyote), 11500 (possession of demerol) and 11531 (sale of marijuana), and Business and Professions Code, sections 4227 and 4230 (sale and possession, respectively, of dangerous drugs). The conspiracy count set

forth 12 overt acts alleged to have been committed in furtherance of the conspiracy. In successive counts, appellant was charged with possession of three narcotics for sale, in violation of the Health and Safety Code: marijuana (§ 11530.5), demerol (§ 11500.5) and peyote (§ 11500.5).

Having waived a jury, appellant was tried alone: the disposition of the charges against Van de Bogart does not appear in the record. The trial court found appellant guilty on all four counts. The appeal is from the judgment of conviction.

Van de Bogart and appellant were arrested together on March 23, 1965.[1] The arrest culminated an intensive investigation by state narcotics agents, in the course of which agent Paquin, working under cover, purchased dangerous drugs from Van de Bogart on several occasions. All or most of the purchases were made with serial-recorded state currency, and the activities of appellant and Van de Bogart were kept under close surveillance at all relevant times during a period of two months.

According to the evidence, the investigation began when Agent Paquin bought a quantity of dangerous drugs from Van de Bogart on January 19. He made further purchases during the next two weeks. On February 5, he and Van de Bogart discussed a possible sale of marijuana. Van de Bogart said that "he had run into an old contact of his" who "was to get in touch with him in the next few days." The "contact" could supply Van de Bogart with any amount of marijuana he wanted, but Van de Bogart "would not deal in any quantity less than ten kilos."

On February 17, after Van de Bogart had indicated to Paquin that he was in contact with his "connection," he was seen to meet with appellant. The two transferred a large box from appellant's automobile trunk to Van de Bogart's. The latter made a drug sale to Agent Paquin shortly thereafter on the same day, delivering the drugs in a large box from the trunk of his car. Appellant having surfaced in the investigation, the agents commenced a surveillance of his place of business on March 12.

Appellant's business was the Hart Trucking Company, an apparently legitimate enterprise owned by him and a partner. A search and seizure point on the appeal requires a discussion of the physical layout of the business premises. The layout was described in the testimony of several of the state narcotics

---

[1] All events and dates mentioned herein occurred in 1965.

agents, and with detail in a rough diagram drawn by Agent Grace and received in evidence. From both sources, the following facts appear:

The address of the Hart Trucking Company is 121 West 33d Street in the City of Los Angeles. The business occupies a block-long lot which runs from 33d Street on the south to 32d Street on the north, with a gate opening through a fence to each street. There are three structures on the lot. The "warehouse" and an office building are located inside the fence near the 33d Street gate. The third structure is a "van" located near the 32d Street gate at the extreme north end of the lot.

The van was variously described in the testimony as a "van," "box," "reefer," "van box," and "the refrigerated portion of a large truck that . . . [can be removed from] . . . the chassis." It was also shown that the van is not on a "truck bed and on wheels," but "has been removed from the truck and is on the ground." The van was fitted with two doors, one on the rear and one on the side.

Referring to his diagram, agent Grace testified that it was not possible to drive through the lot from 33d Street to 32d Street, and that a vehicle moving from one gate to the other was required to exit from the property and circle the block to the other gate. He indicated on the diagram that "parked cars" occupied the lot between the southerly warehouse and the van on the north. He did not testify that the vehicles prevented passage between the structures, but he indicated no other barrier: and there is no evidence that the full length of the lot cannot be traversed on foot.

On March 12, Van de Bogart told Agent Paquin that he could deliver another agreed quantity of drugs when he had heard from his "connection." He received an advance payment from Paquin in the late afternoon. On the same afternoon, appellant's automobile was parked at the "warehouse" on the Hart Trucking Company premises. At 5 p.m., appellant drove it away and met Van de Bogart at the Vagabond Motel. They transferred a large box and a brown paper bag from appellant's automobile trunk to Van de Bogart's, and Van de Bogart paid appellant some money. Just before this occurred, Van de Bogart had telephoned Paquin and said that he was "with his connection." Immediately afterward, Van de Bogart drove to a point prearranged with Paquin and delivered drugs to him in a large box and a brown paper bag removed from the trunk of Van de Bogart's automobile.

On March 22, Agent Grace executed an affidavit for issuance of a search warrant. The affidavit recited the observations of Grace and his fellow agents during the preceding investigation. Concerning the events of March 12, the affidavit declared that appellant had driven to his rendezvous with Van de Bogart from the warehouse on the Hart Trucking Company premises, and had returned to that point afterward. The affidavit also alleged Grace's belief "that said subject Fitzwater has dangerous drugs and narcotics in his possession at the warehouse of the Hart Trucking Company, 121 West 33d Street, Los Angeles." The van on the Hart Trucking Company premises was not mentioned in the affidavit.

Upon all the allegations in the Grace affidavit, a judge of the Municipal Court of Los Angeles Judicial District issued a warrant on March 22. The warrant authorized a search of Van de Bogart's residence, his and appellant's automobiles, the persons of both, and "A warehouse at 121 West 33rd Street, Los Angeles, California, occupied by Hart Trucking Company, and appurtenances; . . ."

On March 23, Van de Bogart and Agent Paquin discussed another drug sale. Van de Bogart said that "he was going to where his connection works," and arranged to meet Paquin at 2 p.m. At 1 p.m., Van de Bogart drove to the Hart Trucking Company, met appellant, and left after the two had spent a few minutes together in a nearby bar. Van de Bogart met Paquin shortly after 2 p.m. and told him that "he had contacted his connection" and had arranged for a quantity of drugs which would cost Paquin $2,125. Paquin agreed to the terms and paid Van de Bogart an advance of $500 in $20 bills of serial-recorded state currency. Van de Bogart said that "he was supposed to meet the man at approximately 2:30 p.m.," and agreed to meet Paquin later in the day.

In the early afternoon of March 23, Agents Grace, Mahan and Longuevan all had the Hart Trucking Company under surveillance. Longuevan watched the premises from an automobile which he parked at successive locations on the 32d Street side of the premises. Longuevan's testimony at the trial clearly showed that his mission was to observe the north end of the property, at which the van was located.

At 2 p.m., appellant drove out of the Hart Trucking Company premises through the 33d Street gate, circled the block, and backed up to the van through the 32d Street gate. He removed three large boxes from the van and placed them in the trunk of his automobile. Shortly thereafter, he drove

away, picked up Van de Bogart, and drove him to the Vagabond Motel. Appellant parked his car next to Van de Bogart's, which was in the motel parking lot. They then moved two large boxes from appellant's automobile trunk to Van de Bogart's, at which time the covering agents arrested both men. The agents seized the two boxes from Van de Bogart's open trunk and a third from appellant's.

Appellant and Van de Bogart were advised of their rights and of the March 22 search warrant. Some of the agents, with appellant in their custody, then drove back to the van at the Hart Trucking Company premises. The van was padlocked. Asked what was in the van, appellant stated that it contained only tools and some of his personal belongings. He had several keys on his person, but none fitted the lock on the van.

Pursuant to the March 22 search warrant and with appellant looking on, the agents entered the van—apparently by force—and seized large quantities of narcotics and dangerous drugs. The narcotics included marijuana, peyote and demerol in a locked suitcase. Shown the suitcase, appellant said "I don't know anything about it," whereupon the agents quickly opened it with one of the keys from appellant's person.

During the search of the van, one of the agents seized a roll of money from appellant's person. The roll—$500 in $20 bills—was shown from the bills' serial numbers to be the money which Agent Paquin had paid to Van de Bogart before the arrest. The same agent, referring to the van, asked appellant "if there was any more stuff here." Appellant replied, "No, you have it all." In the jargon of the narcotics and drug trade, "stuff" means narcotics or dangerous drugs.

After the van had been unloaded, Agent Grace had a conversation with appellant. According to Grace's testimony, "I asked Mr. Fitzwater, 'Do you use any of this stuff,' and he replied, 'What do you think I am, a fool,' and then I asked him, 'Well, do you or don't you,' and he replied, 'No.'" They then discussed appellant's ownership of the Hart Trucking Company. Grace testified that "I then asked him, 'How are you doing in this [trucking] business,' and he said, 'Real good,' and I followed by asking him, 'How come you got yourself all involved with this pill and weed action,' and he replied, 'That's easy money.'"

At the trial, it was established by stipulation that appellant owned a 51 percent interest in the Hart Trucking Company, with a partner owning 49 percent: and that the partner did not have a key to the van which the officers had searched.

Over appellant's objections, the trial court admitted in evidence all or most of the dangerous drugs sold to Agent Paquin by Van de Bogart, together with various boxes, bags and other containers in which the drugs had changed hands. The containers were identified by Paquin, and other agents testified that those delivered to him on February 17 and March 12 were similar to those moved from appellant's automobile to Van de Bogart's before the sales to Paquin on both dates. Also over objection, the court admitted boxes, containers and dangerous drugs seized from the trunks of appellant's and Van de Bogart's automobiles at the time of the arrest; and the containers, contraband and other items seized from the Hart Trucking Company van pursuant to the March 22 search warrant.

Appellant contends (1) that the evidence seized in the van was inadmissible because it was seized in an illegal search, (2) that the evidence is insufficient to support his conviction of conspiracy, and (3) that the evidence is insufficient to support his conviction on the three counts charging possession of narcotics for sale. We hold against all three contentions, and the judgment must be affirmed.

### Search and Seizure

Appellant correctly points out that the search was not validated by consent on his part (cf. *People* v. *Michael* (1955) 45 Cal.2d 751, 752-753 [290 P.2d 852]), and that it occurred too far from the point of his arrest to be reasonable as an incident thereto.[2] (*People* v. *Shelton* (1964) 60 Cal.2d 740, 744 [36 Cal.Rptr. 433, 388 P.2d 665].) The search was valid, therefore, only if it was lawfully conducted pursuant to the March 22 warrant: and appellant's argument to the contrary is based upon his claim that the officers searched a place which the warrant did not describe. The point raises questions concerning both the adequacy and the meaning of the description in the warrant.

"Constitutional concepts condemn 'general' warrants which impose little or no restriction on the area to be searched. . . . [Citations.]" (*Williams* v. *Justice Court* (1964) 230 Cal.App.2d 87, 101 [40 Cal.Rptr. 724].) The constitutionally protected right of privacy is readily violated if

[2]There is no direct evidence of the distance between the Vagabond Motel and the Hart Trucking Company. Appellant's brief asserts that it was "one mile," and the evidence of the time required to drive it indicates that it was at least a mile.

law enforcement officers, for lack of a warrant specifically defining the extent of their search, are free to determine it for themselves. (*Trupiano* v. *United States* (1948) 334 U.S. 699, 710 [92 L.Ed. 1663, 1667, 68 S.Ct. 1229].) It is, therefore, constitutionally essential to the validity of a search warrant that its underlying showing of probable cause, and the warrant itself, describe with particularity the place to be searched. (U S. Const., 4th Amend.; Cal. Const., art. I, § 19; Pen. Code, §§ 1525, 1529; *People* v. *Estrada* (1965) 234 Cal. App.2d 136, 145 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307].)

■ " 'The basic requirement is that the officers who are commanded to search be able from the "particular" description of the search warrant to identify the specific place for which there is probable cause to believe that a crime is being committed.' " (*People* v. *Estrada, supra,* 234 Cal.App.2d at p. 146 [quoting *United States* v. *Hinton* (7th Cir. 1955) 219 F.2d 324, 326].) The requirement is met if the description in the warrant is such that the officers "can, with reasonable effort, ascertain and identify the place intended." (*People* v. *Estrada, supra* [quoting *Steele* v. *United States* (1925) 267 U.S. 498, 503 (69 L.Ed. 757, 760, 45 S.Ct. 414)].)

■ In the present case the warrant's description was clearly sufficient as to the "warehouse" itself: the issue is whether the description included the van so as to validate its search,[3] and the answer turns upon the significance of the words "and appurtenances."

We have been directed to no California authority dealing with the use and reach of the term "appurtenances" in a search warrant. Elsewhere, it has been held that a search warrant describing the place of search as the " 'room, house, outhouse, yard, garden *and appurtenances thereto belonging,* occupied by [a named person at a specific location] . . .' " (italics added) was sufficient under a constitutional provision similar to California's. (*Rose* v. *State* (1909) 171 Ind. 662, 668 [87 N.E. 103, 105-106, 17 Ann. Cas. 228].) Another court has stated that "Ordinarily, a search warrant covers the curtilage *and appurtenances* of the place described." (*Ford* v. *State* (1926) 34 Okla. Crim. 184, 185 [245 P. 909, 910]. [Italics added.] See also Annotation, 31 A.L.R.2d 864 [fn. 2 and cases cited]; Kolbrek and Porter, The Law of Arrest Search and Seizure (1965) p. 353.)

A California court has recognized that the term "appurte-

---

[3] So far as appears, the "warehouse" itself was not searched at any time.

nances'' can be properly used in a sense broader than its technical legal meaning: e.g., in the sense of the word ''addition.'' (*California Title Ins. & Trust Co.* v. *Pauly* (1896) 111 Cal. 122, 125 [43 P. 586]. See 7 Ops. Cal. Atty. Gen. 384, 391.) Its nontechnical meaning in the singular is ''a subordinate part, adjunct, or accessory''; in the plural, ''accessory objects used in any function.'' (Webster's New Internat. Dict. (3d ed. 1965) p. 107.) By technical and common definition alike, a ''warehouse'' is a place of storage. (See, e.g., Civ. Code, § 1858.04; Com. Code, § 7102, subd. (h); Webster's New Internat. Dict., *supra,* at p. 2576.) Storage functions are commonly performed by persons in the trucking business. (See, e.g., Pub. Util. Code, § 239.) According to the several descriptions of the dismounted Hart Trucking Company van in the evidence, it appeared to have been used for storage as an ''adjunct'' or ''accessory'' to the warehouse on the premises.

Appellant points to the fact that the March 22 warrant authorized a search of the warehouse and appurtenances ''at 121 West 33rd Street,'' whereas the van was located at a gate on 32d Street. Similar problems frequently arise when a warrant is directed to premises occupied by several tenants. In such case, the warrant is ordinarily void if it fails to specify the subunit to be searched, unless there is probable cause to search the entire premises. (*People* v. *Govea* (1965) 235 Cal.App.2d 285, 300 [45 Cal.Rptr. 253]; *People* v. *Estrada, supra,* 234 Cal.App.2d at p. 146; Annotation, 11 A.L.R.3d 1330, 1333 et seq.)

The warrant is sufficient, however, if the premises described in it are in fact a single integral unit subject to the control of one person. (*People* v. *Govea, supra; People* v. *Gorg* (1958) 157 Cal.App.2d 515, 523 [321 P.2d 143]; Annotation, 11 A.L.R.3d, *supra,* at pp. 1341-1343.) In determining whether the place described in a warrant is such a unit, it is significant that any part of the place is accessible, and not separated by any real barrier, from any other part. (See *Steele* v. *United States, supra,* 267 U.S. 498 at pp. 502-503 [69 L.Ed. 757 at p. 760]; *United States* v. *Thomas* (N.D. Cal. 1963) 216 F.Supp. 942, 946 [warrant for a house ''and outbuildings'' did not validate search of a ''shack'' 500 feet from the house with a fence and other barriers between them].)

There is no evidence that the Hart Trucking Company premises had a 32d Street address; nor that the premises were physically divided in any real sense; nor that

488

the entire lot was other than a single integral unit under appellant's control as a 51 percent interest owner of the Hart Trucking Company. We have seen that the constitutional vice of imprecision in a search warrant description is that the officers executing the warrant, not being able to identify the place to be searched, are free to determine it for themselves. (*Trupiano* v. *United States, supra,* 334 U.S. 699 at p. 710 [92 L.Ed. 1663 at p. 1672].) This problem did not occur in the present case: the officers knew exactly where they wanted to search, and the only question is whether the place—the van— was included in the warrant description. Under the circumstances of this case—and although the term "appurtenances" is not to be endorsed as an omnibus appendage to descriptions in search warrants—we conclude that the warrant description before us reached the van as an "appurtenance" to the warehouse. We therefore hold that the March 22 warrant validated the search of the van, and that the evidence seized was admissible.

## Evidence of Conspiracy

A criminal conspiracy exists when two or more persons agree to commit a crime and do some overt act in furtherance of the agreement. (Pen. Code, §§ 182, 184; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116].) Its elements are (1) the agreement (2) to commit an unlawful act (Pen. Code, § 182; *People* v. *Marrone* (1962) 210 Cal.App.2d 299, 308 [26 Cal.Rptr. 721]); (3) with two or more persons assenting to the agreement (Pen. Code, § 182; *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567, 593 [35 Cal.Rptr. 401]); each with (4) specific intent to commit the unlawful act (*People* v. *Marsh* (1962) 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300]); and (5) an overt act to effect the object of the agreement. (Pen. Code, § 184; *People* v. *Cockrell, supra.* For the elements of conspiracy generally, see 1 Witkin, Cal. Crimes (1963) Elements of Crime, §§ 105-119, pp. 99-112.)

An agreement between alleged conspirators may be circumstantially inferred from evidence of their conduct in "mutually carrying out a common purpose in violation of a penal statute." (*People* v. *Cockrell, supra,* 63 Cal.2d 659 at pp. 667-668.) Their specific intent to commit an unlawful act may also be shown by circumstantial evidence. (*People* v. *Bowman* (1958) 156 Cal.App.2d 784, 798 [320 P.2d 70].)

A conspiratorial agreement between appellant and

Van de Bogart, and the specific intent of each, is shown by the evidence of two transactions (on February 17 and March 12) in which appellant delivered containers to Van de Bogart and was paid by Van de Bogart after one delivery (on March 12), with the circumstances of each occasion supporting the inference that the containers held dangerous drugs which Van de Bogart promptly sold to Agent Paquin; and of another transaction on March 23, in which appellant and Van de Bogart were arrested in the act of a third delivery for which appellant had been paid in recorded funds later found in his possession. The same two elements are further established by the evidence seized in the Hart Trucking Company van; by the inference that appellant was Van de Bogart's "connection" for both dangerous drugs and marijuana; by appellant's false statements concerning the contents of the van before it was searched (see *People* v. *Osslo* (1958) 50 Cal.2d 75, 93 [323 P.2d 397]) ; and by his admission that he was "involved in this pill and weed action" for the "easy money."

The foregoing evidence also established the complicity of two persons, a series of unlawful acts which were the subject of their agreement, and several overt acts in which they transacted illicit business with each other. In its entirety, the evidence—which reflects a criminal investigation both classic in method and meticulous in detail—is ample to support appellant's conviction of conspiracy.

### Evidence of Possession For Sale

Unlawful possession of narcotics is established by proof (1) that the accused exercised dominion and control over the contraband, (2) that he had knowledge of its presence, and (3) that he had knowledge of its narcotic character. (*People* v. *Groom* (1964) 60 Cal.2d 694, 696 [36 Cal.Rptr. 327, 388 P.2d 359] ; *People* v. *Sedacca* (1965) 238 Cal.App.2d 190, 193 [47 Cal.Rptr. 657].) The three elements may be proved by circumstantial evidence and reasonable inferences drawn from such evidence. (*People* v. *Groom, supra,* at pp. 696-697; *People* v. *Lloyd* (1976) 253 Cal.App.2d 236, 240 [61 Cal.Rptr. 138].)

Appellant's conviction on each of the three counts charging possession of narcotics for sale involves the narcotics seized from the Hart Trucking Company van. His dominion and control over the contraband, and his knowledge of its presence, were established by the evidence of his access to the

van, his entering it, his references to the ''stuff'' in the van, and his possession of a key to the suitcase in which some of the narcotics were found. His knowledge of the contraband's narcotic character was shown by his references to the ''stuff'' and to the fact that he did not personally use it; his false statement concerning the contents of the van and his false denial of knowledge of the suitcase; and his explanation for being ''involved in this pill and weed action.''

The inference that appellant possessed the narcotics for sale rather than for personal use is supported by the large quantity of marijuana found in numerous sizes and containers[4] in the van (*People* v. *Robbins* (1964) 225 Cal.App.2d 177, 184 [37 Cal.Rptr. 244]). Apart from quantities, the same inference is supported by the fact that all three narcotics were kept in a place of storage and not a residence (*People* v. *Rodriguez* (1965) 238 Cal.App.2d 682, 685 [48 Cal.Rptr. 117]), and by his statement that he did not use the ''stuff'' himself.

Appellant suggests, both casually and inconclusively, that the state agents should not have questioned him after he had been arrested and advised of his rights,[5] and that they had solicited him to commit a crime. The suggestions are without merit.

The judgment is affirmed.

Devine, P. J., and Christian, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 22, 1968.

---

[4]The search produced about six pounds of marijuana, lesser amounts of demerol and peyote.

[5]Appellant does not contend that he was inadequately advised of his rights. His trial commenced in March 1966. Accordingly, the ''custodial interrogation'' rule of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] does not apply. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 686 [56 Cal.Rptr. 293, 423 P.2d 221].)