[Crim. No. 5105.   Third Dist.   May 20, 1969.]

THE PEOPLE, Plaintiff and Appellant, v. ROBINSON
WHITING COULON et al., Defendants and Respondents.

Thomas C. Lynch, Attorney General, Jack R. Winkler and Michael H. Fabian, Deputy Attorneys General, for Plaintiff and Appellant.

James E. Kleaver and William Heidewald, Public Defenders, and Larry G. Bacon, Assistant Public Defender, for Defendants and Respondents.

FRIEDMAN, J.—Defendants were charged with possession of two marijuana cigarettes. At their preliminary examination and again by a motion to set aside the information, they

claimed invalidity of the search warrant which produced the cigarettes, urging unconstitutional vagueness of the warrant and supporting affidavits. The superior court granted the motion to set aside the information and the People appeal.

One of the two affidavits, that of a Siskiyou County deputy sheriff, reported information received by another police department from an informant who said that during the early morning hours of July 5, 1968, he had driven with four persons to a "hippy [sic] ranch" somewhere in the Iron Gate Dam area; that these persons delivered six kilos of marijuana, plus methedrine, "smack," mescaline and LSD to "some hippies who took it into the house on the ranch;" that darkness prevented the informer from describing the location in more detail.

The next day, July 6, another deputy sheriff executed an affidavit stating that he was familiar with all the ranches in the northeastern portion of Siskiyou County; that in January 1968 he had been at the "Old Quadros Ranch" assisting in a narcotics arrest. The affidavit continued: "[T]he Old Quadros Ranch . . . is the only ranch in the northeast portion of the county which is regularly occupied by hippies. The owner of the ranch is absent, and the premises are leased or otherwise occupied with the consent of the owner by hippies. When I was on the premises in January, 1968, there were ten adults and two children who claimed to be living in the house. At that time the smell of marijuana was very strong in the house, but none was observed.

"The premises consist of 640 acres, approximately, upon which there is a house, barn, and two outbuildings. I have today [i.e., July 6, 1968] observed, in addition, 1 tepee and 5 campsites on the premises and seven adults who appeared to be at home on the place, some in typical hippy [sic] garb, some naked, doing gardening, carrying water, and other household chores."

On the basis of these affidavits a magistrate issued a search warrant commanding search of "the house, outbuildings, tepees, and campsites at the Old Quadros Ranch in Siskiyou County, as well as the persons in residence there for the following: Marijuana, methedrine, heroin, morphine, mescaline, and LSD. . . ."

Armed with a search warrant, a group of peace officers raided the Old Quadros Ranch at about 5:30 a.m. the next day, July 7. Defendant Coulon and his codefendant, Miss Gooley, were living in a camp near a creek on the ranch. A

deputy sheriff came up the creek to the camp. They were in bed when he arrived. He told them why he was there and proceeded to search the area of their camp. Miss Gooley asked to make a pot of coffee. As she was doing so, the deputy saw her reach into a brown jar and withdraw two items. He asked her for them and she gave him two marijuana cigarettes, saying, "I guess you've got us."

In addition to the house and outbuildings, there were five campsites on the Old Quadros Ranch, three of which were occupied. The creekside camp of defendants was 300 yards upstream from the nearest campsite. No other inhabited place could be seen from defendants' camp. One officer estimated the number of ranch inhabitants at 18 to 20, but another observed only seven or eight adults and two children.

■ Constitutional concepts condemn "general" search warrants with little or no restriction on the area of search; both the affidavit upon which it is based and the warrant itself must describe the place of search with particularity; the requirement of particularity is met if the description is such that the searching officers can, with reasonable effort, ascertain and identify the place intended.[1] ■ In the case of dwellings, the "place" is usually a single living unit, that is, the residence of one person or family; a warrant directing a search of an apartment house or dwelling place containing multiple living units is void unless issued on probable cause for searching each separate living unit or believing that the entire place is a single living unit; a group of adults, nevertheless, may share a single dwelling unit as a common residence, and a warrant describing that unit as the "place" to be searched is constitutionally adequate.[2]

In support of the warrant, the people argue that the activities of the hippies on the ranch "indicate a back-to-nature type of communal living" which qualified the entire ranch as a single living unit or household. We apply several criteria to

[1]U.S. Const., Fourth Amendment; Penal Code, section 1525; *Stanford* v. *Texas* (1965) 379 U.S. 476, 481-483 [13 L.Ed.2d 431, 434-435, 85 S.Ct. 506]; *Steele* v. *United States* (1925) 267 U.S. 498, 503 [69 L.Ed. 757, 760, 45 S.Ct. 414]; *People* v. *Fitzwater* (1968) 260 Cal.App.2d 478, 486 [67 Cal.Rptr. 190]; *People* v. *Estrada* (1965) 234 Cal.App.2d 136, 145 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307].

[2]*People* v. *Govea* (1965) 235 Cal.App.2d 285, 300 [45 Cal.Rptr. 253]; *People* v. *Layne* (1965) 235 Cal.App.2d 188, 192 [45 Cal.Rptr. 110]; *People* v. *Gorg* (1958) 157 Cal.App.2d 515, 523 [321 P.2d 143]; see also *United States* v. *Hinton* (7th Cir. 1955) 219 F.2d 324, 326; *People* v. *Rogers* (1969) 270 Cal.App.2d 705, 711 [75 Cal.Rptr. 919]; Note, 11 A.L.R.3d 1330, at pp. 1341-1343.)

this contention. ▉ The first is the general standard voiced by the federal Supreme Court for testing and interpreting search affidavits: "If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

▉ ". . . where . . . circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." (*United States* v. *Ventresca* (1965) 380 U.S. 102, 108-109 [13 L.Ed.2d 684, 688-689, 85 S.Ct. 741].)

▉ A parallel notion is expressed in California rules which view issuance of a search warrant as a judicial act of the magistrate (*Dunn* v. *Municipal Court* (1963) 220 Cal. App.2d 858, 869 [34 Cal.Rptr. 251]) and enjoin a reviewing court to upset a warrant only if it fails as a matter of law. (*People* v. *Govea, supra,* 235 Cal.App.2d at p. 297.)

▉ Another criterion is the California doctrine of judicial notice. A court may recognize facts "of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute." (Evid. Code, § 451, subd. (f).)

▉ Viewed by these criteria, the term "hippies" has a limited (but only a limited) significance here. "Hippie" has wide currency as a description of a contemporary social phenomenon. The term denotes an unconventional young person in rebellion against competitive middle-class values, who usually consorts with his own kind and tends to symbolize his rebellion through hirsuteness and picturesque garb.[3] As a

---

[3]In an article entitled "The Flower Children," the Encyclopedia Britannica quotes the following definition: "The hippies are escapists from the affluent society that produces and sustains them. They are opposed to the everyday middle aged values of affluent America—its commercialism, mechanism and bureaucracy; its car culture, hygiene and unquestioned acceptance of the work ethic and the quick buck."

The Britannica article cites an intensive sociological study of 50 residents of the Haight-Ashbury "scene" chosen because of their costume

group description, it signifies persons sharing a limited set of common characteristics. In college communities many students adopt the external appearance of hippies, making the term dubious as a physical identification. In a rural area such as Siskiyou County common sense and judicial notice combine to permit recognition of the term as a generalized description of external appearance, adequate for the purpose of group identification.

■ In the trial court defendants urged that the informant had been able to identify only the general location of the narcotics delivery point; that the deputies had no probable cause to pinpoint the Old Quadros Ranch as the location of contraband; hence that the search warrant failed. The informant had provided the officers with two clues to the delivery point: first, that it was a ranch somewhere in the Iron Gate Dam area; second, that persons whom he described as hippies took the narcotics into the ranch house. The officers had several pieces of preexisting information: one, that Old Quadros Ranch was in the same general area; two, that this was the only ranch in the area regularly occupied by persons described as hippies; three, that the ranch house had once been redolent of marijuana. Since persons physically described as hippies were identified at the ranch where the narcotics were received and at the Old Quadros Ranch as well and since the latter had a past association with narcotics, the officers could reasonably entertain an honest and strong suspicion that the ranch visited by the informant had been the Old Quadros Ranch, a suspicion which the magistrate could appropriately accept as probable cause for accepting the latter as the contraband's location.

At that point the term "hippie" exhausts its value. To view the appellation as evidence of specific behavior at the specific time and place bursts the boundary of judicial notice. As an individual, the magistrate could reasonably suppose that some hippies live communally. (See fn. 3, *supra*.) Acting judicially, he could not accept that supposition as evidence

and manner: ". . . Only 14% lived alone, 25% shared quarters with 10 or more people; 2% were above the age of 30, 60% between 16 and 21, 36% between 22 and 30, and 2% under 16; 69% were employed; 70% were from outside California, 60% from cities; 68% had some college education; 44% had a father who went to college and 46% a mother who went to college; 96% stated that they at some time had smoked marijuana, 90% that they had taken LSD, but 'very few' had ever tried any of the addictive drugs, such as heroin." (Encyclopedia Britannica, 1968 Book of the Year, pp. 790-791; see also, *Hughes* v. *Rizzo* (1968) 282 F.Supp. 881, 882.)

that the particular hippies inhabiting the Old Quadros Ranch were living in a single communal establishment. ▮ Since no inference of communal living may be drawn from the term "hippies," the warrant's sufficiency must rest upon other factors.

▮ In determining the validity of the search warrant, the primary question is "whether the affiant had reasonable grounds at the time of his affidavit and the issuance of the warrant for the belief that the law was being violated on the premises to be searched . . ."[4] ▮ In brief, the warrant's validity depends upon the showing before the magistrate at the time it was issued.[5] Consequently, the courts hold that a warrant showing probable cause for searching an entire establishment has continued validity even after the search reveals the existence of separate dwellings within the establishment.[6] ▮ If the affidavits show advance awareness of sufficient facts, the magistrate may justifiably find probable cause for the search of the entire premises even though occupied by different families or tenants.[7]

The present case is unlike those dealing with apartments or rooming houses physically and figuratively divided into separate households and separate tenancies. ▮ The zones of privacy protected by the Fourth Amendment are not so much a product of physical or legal boundaries as of Fourth Amendment purpose. The constitutional demand for particularity seeks to protect the privacy of innocent persons by limiting the search to the place where there is probable cause to believe the search object is located. (See *Camara* v. *Municipal Court*, fn. 9, *infra*.) ▮ The authority to search for contraband and seize it on described premises extends "to all parts of the premises used for the unlawful purpose."[8]

---

[4]*Dumbra* v. *United States* (1925) 268 U.S. 435, 441 [69 L.Ed. 1032, 1036, 45 S.Ct. 546]; see also, *United States* v. *Poppitt* (D.C.Del. 1964) 227 F.Supp. 73, 77; *Williams* v. *Justice Court* (1964) 230 Cal.App.2d 87, 94 [40 Cal.Rptr. 724]; *Arata* v. *Superior Court* (1957) 153 Cal.App.2d 767, 773 [315 P.2d 473].

[5]*United States* v. *Hinton, supra,* 219 F.2d at p. 326.

[6]*Minovitz* v. *United States* (D.C. Cir. 1962) 298 F.2d 682, 684 [112 App. D.C. 21]; *United States* v. *Santore* (2d Cir. 1960) 290 F.2d 51, 66-67, cert. den. 365 U.S. 834 [5 L.Ed.2d 744, 81 S.Ct. 749]; *Carney* v. *United States* (6th Cir. 1935) 79 F.2d 821, 822; *United States* v. *Poppitt, supra,* 227 F.Supp. at pp. 77-78; *United States* v. *Nagle* (Dist. Ct. N.Y. 1929) 34 F.2d 952, 956.

[7]*Hogrefe* v. *United States* (9th Cir 1929) 30 F.2d 640, 641; *Tynan* v. *United States* (9th Cir. 1924) 297 F. 177; see cases cited fn. 2, *supra*.

[8]*United States* v. *Rabinowitz* (1950) 339 U.S. 56, 62 [94 L.Ed. 653, 658, 70 S.Ct. 430], quoting *Marron* v. *United States* (1927) 275 U.S. 192, 199 [72 L.Ed. 231, 238, 48 S.Ct. 74]. Our attention has been called

■ The affidavits portrayed to the magistrate a single establishment, a large rural property occupied by a house, outbuildings and camps. The camps were separated by space alone, undivided by physical boundaries or the figurative lines of separate tenancies. Of so much the officers were aware. Beyond that, they knew only that a sizeable quantity of narcotics had been delivered at the ranch house and that a group of adults and children inhabited the house and surrounding ranch property. Concerning these people, their familial relationships, their living arrangements, their identification with one area or another of the ranch, their mobility or stability in relation to any particular sleeping and cooking site, the officers knew nothing. There was no reason to assume that the narcotics remained in the ranch house or that the persons who had taken it into the ranch house continued to inhabit that particular structure. Rather, there was probable cause to believe that the contraband, either in bulk or in distributed portions, might be found anywhere on the ranch. To trace the narcotics to compressed spheres of suspicion within the general confines of the ranch would have entailed an elaborate undercover investigation or a self-frustrating giveaway.[9] The entire ranch was suspect.

---

to the "open fields" rule which, according to some authorities, denies Fourth Amendment protection to "enclosed or unenclosed grounds or open fields" around a house (see *Hester* v. *United States* (1924) 265 U.S. 57 [68 L.Ed. 898, 44 S.Ct. 445]; *People* v. *Shields* (1965) 232 Cal. App.2d 716, 719-721 [43 Cal.Rptr. 188]; see, however, *Wattenburg* v. *United States* (9th Cir. 1968) 388 F.2d 853, 856-858.) The rule has been invoked as an aid in determining whether a warrantless search violates permissible territorial limits. Here, in contrast, the problem is validity of the warrant, a problem created before the search and turning upon a determination whether the foray allowed by the magistrate is broader than the zone of probable cause revealed by the affidavits.

[9] It is now clear that Fourth Amendment requirements of reasonableness and probable cause entail a weighing process, in which the governmental interest alleged to justify the official intrusion into privacy is weighed against the intrusion's breadth and character. "To apply this standard [of probable cause], it is obviously necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen. . . . In determining whether a particular inspection [search] is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for the inspection must be weighed in terms of these reasonable goals of code [i.e., law] enforcement. . . . [T]here can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." (*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 534-537 [18 L.Ed.2d 930, 938-940, 87 S.Ct. 1727].)

Inferably, investigatory practicalities form a weight which, among others, is to be thrown on the scales.

Since the magistrate did not err in finding probable cause for a search of the buildings and camps on the Old Quadros Ranch, the search warrant was valid.

Order reversed with instructions to deny the motion.

Janes, J., concurred.

PIERCE, P. J.—I dissent.

The majority opinion expands the scope of the search warrant beyond that justified by the affidavits which supported its issuance.

Courts in their appraisal of affidavits filed for such purpose take into consideration—and rightly so—that they are not prepared with the forethought, care and deliberation one may expect in the drafting of other legal instruments. Frequently they are prepared by laymen and usually—if they are to be effectual—they must be prepared in haste. But there are limits to tolerance. In drawing inferences, magistrates and courts may not take off into the wild blue yonder—not if any semblance of obedience to Fourth Amendment rights is to be observed.

The logic of the majority opinion breaks down in its next-to-last paragraph. After having demonstrated that no inferences of communal living can be drawn from use of the term "hippies," the majority opinion then states that the affidavits showed a "single establishment." That is just what the affidavits did not show. Both the prosecutor and the Attorney General recognized this and tried to correct the deficiency by attaching meaning to the term "hippies."

There is no basis in the affidavits for the majority's statement that the campsites were separated by space alone, for the affidavits described neither the topography of the ranch nor the physical relationship of the campsites to the main house. This was pertinent information if the house was a suspected distribution center for the ranch as the majority assumes. Nor is there a basis for the majority's statement that there were no separate tenancies. The affidavits reveal the officers' ignorance of the living arrangements and familial relationships of the inhabitants of the ranch. The majority opinion acknowledges that ignorance but concludes that there was probable cause to believe that the contraband might be found anywhere on the ranch. This conclusion does not logically follow from the officers' ignorance of the living patterns of the inhabitants. Rather than stating that the officers should have ob-

tained information linking the contraband to each person or place to be searched, the majority has declared that "[t]he entire ranch was suspect."

The majority opinion, in order to fill the gap between that declaration and the officers' apparent ignorance, asserts that *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727], is authority for the proposition that, in determining whether there is probable cause to make a search, the investigatory difficulties of law enforcement officers may be weighed against the breadth and character of the search to be made. *Camara* does not support the use to which the majority puts it. If that were indeed the law, the Fourth Amendment would bar few searches. The Fourth Amendment always hampers, and often frustrates, the investigatory aims of law enforcement. *Camara* dealt with administrative searches, and specifically disclaimed any intention to affect the rules applicable to searches in the enforcement of the criminal law.[1] *Camara* allowed a lesser standard of probable cause to justify administrative searches in the enforcement of housing, fire, health, etc., codes. *Camara* did not weigh enforcement difficulties against intensity of the search in deciding what constitutes probable cause. Rather it allowed a lesser standard of probable cause to justify an administrative search where there was unanimous consent in the administrative field that there could not be an acceptable level of code enforcement under the traditional probable cause test, *and* where the search involved a lesser invasion of personal privacy and dignity because it would focus on house facilities such as gas and plumbing systems and on possible accumulation of garbage and debris rather than on the person and his more personal property.[2] Thus these factors in *Camara* were added together and not weighed against each other as stated by the majority.

The decision in this case is far-reaching. Six hundred forty acres, besides being a square mile, is also a section of land. In the less populated areas and in the mountains of California there are no doubt thousands of "Old Quadros Ranches" where people either with the express or tacit permission of the owners hunt, fish, and camp. To the many persons pitching

---

[1] ". . . Such an approach neither endangers time-honored doctrines applicable to criminal investigations nor makes a nullity of the probable cause requirement in this area." (18 L.Ed.2d at p. 941.)

[2] See LaFave, Administrative Searches and the Fourth Amendment, 1967 Supreme Court Review 1, 11-20.

camp on such lands, their camps—under the majority opinion—are no longer their castles.

A petition for a rehearing was denied June 17, 1969. Friedman, Acting P.J., was of the opinion that the petition should be granted. Respondents' petition for a hearing by the Supreme Court was denied July 16, 1969. Peters, J., was of the opinion that the petition should be granted.