[No. B067466. Second Dist., Div. Six. Jan. 12, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL SMITH, Defendant and Appellant.

[No. B069502. Second Dist., Div. Six. Jan. 12, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MATTHEW POLAN et al., Defendants and Appellants.

**COUNSEL**

Ilan Funke-Bilu, Jeffrey J. Stuetz and Diane E. Berley, under appointments by the Court of Appeal, and Dale A. Amato for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and Leslie P. McElroy, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

YEGAN, J.—Matthew Polan and Charles Richmond appeal from the judgments (orders granting probation) entered upon their pleas of no contest to possession of concentrated marijuana. (Health & Saf. Code, § 11357, subd. (a).) Daniel Smith appeals from the judgment entered following his plea of no contest to cultivating marijuana, possessing marijuana for sale, and conspiracy. (Health & Saf. Code, §§ 11358, 11359; Pen. Code, § 182.) Prior thereto, their motions to suppress evidence were denied. (Pen. Code, § 1538.5.)

Appellants contend that the trial court erroneously denied the suppression motions. The trial court ruled that (1) a "barn" or "outbuilding" which housed over 4,000 marijuana plants was particularly described in a search warrant and (2) the good faith exception rule of *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405] (*Leon*) applied to the particularity clause of the Fourth Amendment. We agree with the trial court

that the "barn" or "outbuilding" was particularly described and affirm on that basis. We do not reach the *"Leon"* issue.[1]

## The Warrant

On December 4, 1991, San Luis Obispo County Sheriff's Deputy Gerald Giese obtained a search warrant which authorized a search of ". . . premises located at and described as . . . 9110 Temettate Drive, Nipomo, CA; further described as a white and aluminum side, double-wide mobile home. The mobile home is marked by a blue wood sided shed which is at the base of the dirt driveway leading to the mobile home. To reach this driveway you take Highway 166 to Suey Creek Road and turn left. You continue approximately 4.5 miles up Suey Creek Road, where you reach about 100 mailboxes and a road named Wildflower. You turn left on Wildflower, which turns into Temettate Drive, and continue for abut 1 mile. The driveway is located 1.2 miles on Temetatte from Suey Creek Road . . . ." The warrant authorized not only the search of the mobile home, but ". . . all rooms and buildings, outbuildings, garages, yard areas, trash containers, storage areas, and containers used in connection with or within the curtilage of said premises and building(s) . . . ." The warrant further ordered the police to search for cocaine in ". . . storage areas where cocaine may be found."

In his supporting affidavit, Giese indicated a confidential and reliable informant had personally observed a cocaine sale at the mobilehome and that methamphetamine and marijuana were also for sale at the mobilehome. Giese described the premises and stated that persons who possess cocaine for sale often keep additional quantities ". . . in or about their residence, outbuildings, trash containers, receptacles, and other storage areas near the residence." The affidavit further stated that ". . . your affiant desires to search the above described residence, garage, and other outbuildings, storage areas, trash containers, and yard areas surrounding said residence for the above described personal property."

Neither the warrant nor the affidavit said that the premises described as 9110 Temettate Drive in Nipomo, California was a 40-acre parcel or that the "barn" was one-quarter to one-half mile away from the mobilehome "as the crow flies."

---

[1]"Whether the description in the warrant of the property . . . [searched] is sufficiently specific is a question of law on which an appellate court makes an independent judgment. [Citations.]" (*People* v. *Frank* (1985) 38 Cal.3d 711, 725 [214 Cal.Rptr. 801, 700 P.2d 415].)

We also observe that because of article I, section 28, subdivision (d) of the California Constitution, federal constitutional law governs the application of the exclusionary rule. (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744].)

*Suppression Hearing*

Appellants moved to suppress evidence pursuant to Penal Code section 1538.5. Appellant Smith testified that he owned the unenclosed 40-acre mountainous property which had the address of 9110 Temettate Drive, Nipomo, California. The "barn" was located on top of a hill about a quarter of a mile to a half a mile from his mobilehome on the property, and the road between the two was at least twice that distance. A main road that serviced other residences led to his mobilehome and divided his property in half. The "barn" and mobile home were on opposite sides of the road. There was fencing around most of the "barn." There were also four gates on the road that led to the "barn," including a gate at the top of the hill. One of the gates was a chain across the road. The officers cut the cable on one gate and removed a chain from another. There was a "no trespassing" sign on the side of Temettate Drive where the "barn" was located. Smith described the area as "very country."

Giese testified he had observed the "barn" on several occasions before December 12, 1991. On one such occasion, Giese was responding to an informant who called Giese about unusual activity at the "barn." Giese also used a thermal-imaging unit to determine that there was heat emanating from inside the "barn." The square footage of the "barn" was larger than that of the mobilehome and shed combined. The "barn" was closed and there was no way to see inside it.

Giese knew that the "barn" was not near the residence. However, he knew it was connected to the property because he was so informed by one of Smith's neighbors. County maps showed that 9110 Temettate Drive was a 40-acre parcel.

Giese believed that an "outbuilding" was any building on the property that was not used as a dwelling. Based on Giese's experience, cocaine could be hidden anywhere, including in "barns."

Giese prepared a search warrant and presented it for review by ". . . the primary [deputy] district attorney to handle narcotics cases for the narcotics task force." When Giese spoke with the deputy district attorney, Giese did not have what he felt was a firm understanding of the meaning of "curtilage." He had concerns about whether the "barn" was covered by the search warrant, and he was ". . . specifically looking for some answers concerning that . . . ." Giese testified that he explained to the deputy district attorney ". . . the description of the property that I had known was on the 40 acres, and there was a large barn and the mobile home was at one end or one corner

of the 40 acres, and the barn was at the other, and I believed the barn and mobile home were connected. [¶] We talked about the barn being an outbuilding, and also, being with the curtilage of the house, and that it can be searched."

Giese told the deputy district attorney where the trailer was and ". . . where the barn was in relationship to the trailer, and asked him what would be included as outbuildings or within the curtilage of the trailer." The deputy district attorney looked at some books and stated that ". . . yes, it was included in the outbuildings, and was within the curtilage of the trailer." Giese discussed the size of the plot and what was located on the plot. The deputy district attorney ". . . felt that was included—the barn was included as outbuildings or other buildings on the property." The deputy district attorney signed the warrant application.

Giese told the magistrate that there was a "barn" on the property. However, he did not discuss the distance between the "barn" and mobilehome or Giese's usage of the thermal-imaging unit. The magistrate issued the warrant as prayed.

Giese testified that his definition of "outbuilding" was ". . . any building that is on the property that's not used as a dwelling" and that it was an "oversight" not to have indicated the size of the parcel or that one of its outbuildings was a barn. However, he did not further describe the barn ". . . because I thought it was an outbuilding."

Giese believed that the warrant authorized the search of ". . . the complete 40 acres and what was located on the 40 acres as outbuildings." Giese had been ". . . involved in other search warrants" over 100 times, had training with respect to the reading and execution of search warrants, including an 80-hour narcotics officer's school, 10 to 15 hours of which dealt exclusively with writing search warrants and descriptions in search warrants, and a recent 9-week basic academy class during which search warrants were covered. Giese had personally written and served over 100 to 150 search warrants.

### The Particularity Clauses

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and *particularly describing the place to be searched, and the persons or things to be seized.*" (U.S. Const., 4th Amend., italics added.)[2]

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, *particularly describing the place to be searched and the persons and things to be seized.*" (Cal. Const., art. I, § 13, italics added; see also Pen. Code, §§ 1525, 1529.)

The italicized portions plainly indicate that the particularity clause is, in realty, two clauses. The first is directed to the place or places to be searched. The second is directed to the persons and/or things to be seized. At issue here is the first particularity clause.

### Guidelines for Review

■ These constitutional provisions are the genesis of what has become to be known as the "preference for warrants rule." (See e.g., *Leon, supra,* 468 U.S. at p. 914 [82 L.Ed.2d at p. 693]; *People v. Frank, supra,* 38 Cal.3d at p. 722.) That is to say, the judiciary should encourage law enforcement officers to obtain judicial authorization to conduct the search that they want to undertake. " 'An evaluation of the constitutionality of a search warrant should begin with the rule that "the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . who may happen to make arrests." [Citations.]' " (*United States v. Ventresca* (1965) 380 U.S. 102, 105-106 [13 L.Ed.2d 684, 687, 85 S.Ct. 741].)

"If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, . . . must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a

---

[2]The particularity clauses of the Fourth Amendment were rooted in the experiences of the infamous "writs of assistance" and "general warrants" of the period. Prior to the Revolutionary War, "[t]he practice had obtained in the Colonies, of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods . . . ." (*Boyd v. United States* (1886) 116 U.S. 616, 625 [29 L.Ed. 746, 749, 6 S.Ct. 524].) Contemporaneously in England, severe abuses ". . . had gradually crept into the administration of public affairs. Prominent and principal among these was the practice of issuing general warrants by the Secretary of State, for searching private houses for the discovery and seizure of books and papers that might be used to convict their owner of the charge of libel." (*Id.,* at p. 626 [29 L.Ed. at p. 749].) Those who drafted the Fourth Amendment had in mind these abusive general authorizations for search. The arguments against these abuses, by James Otis in the Colonies, and Lord Camden in England, were known by the Fourth Amendment drafters. (*Id.,* at pp. 626-627 [29 L.Ed. at p. 749].)

criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." (380 U.S. at p. 108 [13 L.Ed. 2d at p. 689].) Thus, ". . . in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." (*Id.*, at p. 106 [13 L.Ed.2d at p. 687]; *Leon, supra,* 468 U.S. at p. 914 [82 L.Ed.2d at p. 693].)

While the quoted language from *Ventresca* goes to the issue of probable cause, there is no logical reason why the policy considerations underlying its rules do not apply to the particularity clauses. The California Supreme Court has so held. (*People* v. *Frank, supra,* 38 Cal.3d at p. 723.) Were the rule otherwise, perhaps a legal description for the premises to be searched, complete with reference to metes and bounds, assessor's parcel numbers, tract and lot numbers, survey maps, and the like, would be required in every case. We review the warrant's description of the property to be searched in a commonsense and realistic fashion.

### The Magistrate's Command to Search the Premises

We hasten to point out that it would have been preferable for the officer to have expressly indicated that the premises at 9110 Temettate Drive, Nipomo, California, was a 40-acre parcel and that the "outbuilding" which Giese wanted to search was approximately one-quarter to one-half mile away, as the crow flies, from the mobilehome. ■ However, his failure to do so does not inexorably compel the conclusion that the particularity clause has been violated. As indicated, the superior court determined that the particularity clause was not violated. Based on an independent judgment standard, we agree. (See *People* v. *Frank, supra,* 38 Cal.3d at p. 725, see *ante,* p. 945, fn. 1.)

Here, the magistrate commanded the officers to search ". . . the premises located at and described as . . . 9110 Temettate Drive, Nipomo, CA . . . including all rooms and buildings, outbuildings, garages, yard areas, trash containers, storage areas and containers used in connection with *or* within the curtilage of said premises and building(s) . . . ." (Italics added.) Contrary to appellants' claims, we need not dwell on the "curtilage issue" because of the use of the disjunctive "or." Thus, the magistrate ordered the officers to search ". . . all . . . outbuildings . . . storage areas . . . used in connection with . . . said premises . . . ." "[N]othing . . . [was] left to the discretion of the officer executing the warrant." (*Marron* v. *United States* (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74].) The fact the "barn" may not have been within the curtilage is not determinative.

"[A] warrant to search 'premises' located at a particular address is sufficient to support the search of outbuildings and appurtenances in addition to a main building when the various places searched are part of a single integral unit. [Citations.]" *People* v. *Dumas* (1973) 9 Cal.3d 871, 881, fn. 5 [109 Cal.Rptr. 304, 512 P.2d 1208]; see also *People* v. *Weagley* (1990) 218 Cal.App.3d 569, 573 [267 Cal.Rptr. 85].) "The authority to search for contraband and seize it on described premises extends 'to all parts of the premises used for the unlawful purpose.' [Fn. omitted.]" (*People* v. *Coulon* (1969) 273 Cal.App.2d 148, 155 [78 Cal.Rptr. 95], quoting *United States* v. *Rabinowitz* (1950) 339 U.S. 56, 62 [94 L.Ed. 653, 658, 70 S.Ct. 430.)

Here, the premises were described as 9110 Temettate Drive, Nipomo, California. This was a "single integral unit" which comprised 40 acres. The warrant was good for the 40 acres and nothing more. It cannot reasonably be said that it was akin to a "writ of assistance" or a "general warrant." (See *ante,* p. 948, fn. 2.) Thus, we reject appellants' claim that officer Giese took the search warrant and went to the barn like a "wild stallion." Here, the stallion was confined to a 40-acre corral.

### *Nexus to "Barn"*

██ We also reject appellant Smith's claim at oral argument that there was no probable cause to search the "barn" and that no magistrate would have authorized its search. Appellants concede, and properly so, that there was probable cause to search the dwelling, i.e., the mobilehome, on the 40-acre parcel. In such a situation, it was reasonable for a magistrate to authorize the search of any owner-controlled structure on the premises. "In this case, probable cause existed to search the whole [40 acre] ranch. The ranch was rural . . . [and] undeveloped . . . [the defendant] owned the entire ranch, and it was under his . . . control." (*United States* v. *Alexander* (9th Cir. 1985) 761 F.2d 1294, 1301.)

On occasion, we have seen cases where controlled substances purveyors have been lax with respect to the secretion of their wares. Generally speaking, however, they usually attempt to secrete contraband where the police cannot find it. Here, for example, Officer Giese testified that cocaine ". . . can be hidden anywhere. Buried on a piece of property. Can be hidden in barns, under the house, attics, sheds, buildings. Anywhere you can put anything, it can be hidden."

It was not necessary for the affiant to specifically say that one of the outbuildings that he wanted to search was a "barn." A "barn" is a ". . . large farm building used for storing farm products and sheltering livestock." (American Heritage Dict. (2d ed. 1985) p. 158, col. 2.)

Here, the structure did not resemble a traditional wood barn with large doors in the front and a hay loft. This "barn" was a large corrugated silver-colored metal shed. It was reasonably described as an "outbuilding," i.e., "[s]omething used in connection with a main building. A small building appurtenant to a main building, and generally separated from it; e.g. outhouse; storage shed." (Black's Law Dict. (5th ed. (1979) p. 993, col. 1.) More importantly, it was a "storage area" where cocaine could have been found, which is what the magistrate commanded the police to search.[3]

Although the antecedent sale of cocaine at the mobile home, which formed the basis for the probable cause determination, did not take place near the "barn," there was a sufficient nexus thereto to authorize its search.

"All proceedings in this cause have permanently abated as to . . . [Smith] by reason of his death pending appeal and the superior court is directed to enter its order to that effect. [Citations.]" (*People* v. *Dail* (1943) 22 Cal.2d 642, 659 [140 P.2d 828].) The judgments (orders granting probation) as to Polan and Richmond are affirmed.

Stone (S. J.), P. J., and Gilbert, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 12, 1994.

---

[3]We have viewed the videotape of the 40-acre parcel and the structures upon it. The tape was introduced as defendant's exhibit B at the suppression hearing.