[Crim. No. 16551. First Dist., Div. Three. Jan. 19, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES THERON ELLIOTT, Defendant and Appellant.

**COUNSEL**

Harry J. Delizonna for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

SMITH, (P. A.), J.*—James Theron Elliott appeals his convictions of conspiracy to commit murder, robbery, grand theft and insurance fraud, murder in the first degree (for hire) and robbery in the first degree.

### ISSUES

1. Was appellant prejudiced by the manner in which count one (the conspiracy count) was pleaded?

2. Was the trial court correct when it denied appellant's motions to suppress certain evidence?

### STATEMENT OF THE CASE

Appellant went to trial following his not guilty plea to an information charging him and Mr. Daniel Thompson (hereinafter Thompson) and Charles Thomas (hereinafter Thomas) in three counts. Count one alleged that these three men conspired to commit murder (Pen. Code, § 187), and the filing of a false insurance claim. Five overt acts in furtherance of the conspiracy were alleged.

Count two alleged the murder of Ben Rudman. It also charged Thomas with use of a firearm during the murder (Pen. Code, § 12022.5), alleged Rudman was murdered pursuant to an agreement to accept payment from appellant Elliott, and that Thomas killed Rudman deliberately and with premeditation and in the course of a robbery.

Count three charged the three defendants with robbery of Rudman's jewelry and personal property.

The trial of Thomas was severed pursuant to motion made on November 19, 1975.

On February 9, 1976, appellant was found guilty of conspiracy to commit murder, robbery, grand theft and insurance fraud, murder in the first degree and robbery in the first degree.

Thompson was found not guilty on any of the charges.

*Assigned by the Chairperson of the Judicial Council.

On February 20, 1976, after the second phase of the trial the jury found the allegation that the murder (count two) was intentional and committed pursuant to an agreement to receive valuable consideration from appellant, Elliott.

On April 16, 1976, appellant was sentenced to death on count two, and to serve consecutive prison sentences for counts one and three. (The trial judge stated that if a higher court nullified the death penalty, then the punishment for counts one and three would be consecutive to that of count two.) Elliott's appeal to the California Supreme Court was automatic. The Supreme Court has since ruled that the death penalty is unconstitutional and by its order, Elliott's appeal was transferred to this court.

At the time of oral argument (and after submission of their brief) respondent filed their written request to file a supplemental brief on the issue as to whether this court should modify appellant's death sentence to life, or to remand to the trial court for proceedings under Penal Code section 190.3.

## STATEMENT OF FACTS

In July 1972, Frank Richards and appellant became partners in a restaurant chain in southern California. They took out insurance policies on each other's lives and the policy on Richards' life was $100,000.

Thomas, who is Elliott's uncle, went to Richards' office on December 3, 1973, and at that time, held a revolver on him, advised him to give him his money, and shot him twice in the chest and then in the head. Richards saw Thomas pick up the money and run, and at the trial identified him as the robber.

Three weeks later, Thomas wrote out a statement regarding this shooting, stating that Elliott hired him to kill Richards for a sum of money. Thomas then instructed his wife to read this statement to Elliott on the phone, which Mrs. Thomas did, stating that if Elliott didn't give Thomas the money, Thomas would send the statement to the police. As of November 1974, Thomas had not received the money that Elliott promised for the assassination of Frank Richards. However, Elliott did assist Thomas who was on welfare to purchase a home, by giving him a reference which falsely stated that Elliott had employed Thomas for 10 years.

Stephen Gilbert and Nicholas Krager, casual friends of appellant, testified that in 1973 he told them that he wanted to kill his business partner and offered Krager, a former policeman, $10,000 to do the job.

In November 1974, Robert Torres opened a jewelry store in Oakland and employed Copansky as a sales manager. Torres approached Thompson for a loan using accounts receivable as collateral. Thompson suggested appellant Elliott as a lender. Elliott said that as a condition of the loan, Torres and Copansky would each have to take out $500,000 insurance policies with appellant Elliott as beneficiary. They applied for the insurance on November 5, 1974 and on November 15, the policies were cancelled at their request and the loan agreement fell through.

In November of 1974, appellant asked Virginia Thomas to purchase a revolver for him. Mrs. Thomas did so, selecting a .38 caliber revolver at a gun store in Pomona. A few days later, Elliott asked Mr. and Mrs. Thomas to drive to northern California and gave to Mrs. Thomas information which she wrote in a spiral notebook. He gave her the names and home addresses of Robert Torres and Paul Copansky and the addresses of Keepsake Diamond Center in Oakland and Carte Jewelers in San Jose. Elliott told Mrs. Thomas that she could identify Torres and Copansky if she entered their store and asked to examine expensive pieces of jewelry. The owner or manager of a jewelry store typically handles such merchandise. Elliott also gave Mrs. Thomas $50. That night the Thomases drove north, arriving at a Ramada Inn in Fremont early in the morning of November 13.

Mr. and Mrs. Thomas left the motel at 10 a.m. and drove to 4560 Thornton Avenue, then the home of Robert Torres. They parked across the street for a short time and then left, driving to a bar in Fremont where Thomas made telephone calls. While in the bar Thomas told his wife that the purpose of the trip was to shoot one of the men whose names she had written down in her notebook.

After making a 15-minute telephone call to Elliott, Thomas drove to the Westgate Shopping Center in San Jose. Arriving there, the Thomases searched for Carte Jewelers. Thomas told his wife not to enter because he did not want Daniel Thompson to see her. He gave her his gun, possibly the revolver which she had purchased several days earlier for Elliott, and entered the store. When Thomas left the store, he said that he had to contact Elliott. Unable to reach Elliott by telephone, Thomas

returned to the jewelry store where he remained for 20 minutes. Upon leaving the store, Thomas told his wife that Elliott had changed plans and that he was now supposed to "get the other guy." They went to a bar in the shopping center where Thomas placed a telephone call to Thompson to discover the make and model of the car which his would-be victim drove. Thomas gave the information to his wife, who wrote it on a slip of paper which she gave to her husband.

Thomas, who had consumed several drinks in the bars in Fremont and San Jose, was becoming very drunk. Mrs. Thomas suggested that he terminate the plan to kill Torres or Copansky and return to southern California. Thomas could tell Elliott that the store was too crowded to permit him to shoot either of the men. Thomas agreed to go home.

The Thomases spent several hours in a restaurant in the shopping center where Mrs. Thomas tried to induce her intoxicated husband to eat. They returned to their car but could not start it. Unable to obtain help in a service station or to telephone Thomas' brother William in Mountain View, they took a taxicab to the Vagabond Motel in San Jose. Before leaving the shopping center, Mrs. Thomas put the gun in the trunk of the car.

Thomas was able to contact his brother the following day. William Thomas and Bob Anderson drove Mr. and Mrs. Thomas to the Westgate Shopping Center, where they succeeded in repairing the stalled car. Later joined by William's wife, Ruth, the four persons went to several bars in San Jose and Redwood City. Mr. and Mrs. Thomas left for southern California at about midnight.

Sometime later Elliott came to Thomas' house in the morning. He asked for the gun and the ammunition Thomas had bought. He test fired the gun in Thomas' back yard, trying a balloon and a potato as silencers. Appellant told Mrs. Thomas to get some clothes ready for her husband because he and appellant were taking a business trip "up North." Appellant called Danny (Thompson) a couple of times. Mrs. Thomas drove Thomas to appellant's house later that day.

An appointment was arranged for Ben Rudman to meet Danny Thompson on November 26, 1974, at the jewelry store of Mr. Torres and Mr. Copansky. Thompson called Rudman while at Torres' and Copansky's store and arranged to meet him at Carte Jewelers in San Jose to buy a ring from him. Appellant went to Carte Jewelers when Rudman

and Thompson were there, and when the last employee went home, the only ones left in the jewelry shop were appellant, Thompson and Rudman. Later that evening, Rudman and three other men, one of whom resembled Elliott, went to a restaurant and attempted to get dinner.

The last person known to have seen Rudman alive was Angelo Lygizos, owner of a restaurant in San Jose. He testified that Rudman had eaten in his restaurant on November 22 and 25, testimony verified by master charge receipts, and that he and three other men came to his establishment at about 11 p.m. on November 26. One of Rudman's companions resembled Elliott. Since the kitchen was closed, Lygizos suggested that Rudman and his friends dine elsewhere.

The next day, November 27, 1974, Mrs. Thomas picked up Thomas at the Ontario airport. He was wearing different clothes than when he left home, although he didn't take any luggage. The shirt he was wearing had blood on it, and he was nearly drunk. On the same day, he gave Mrs. Thomas a gold ring with yellow and white diamonds.

On December 1, 1974, Mr. Rudman's car was found at the airport and his body was found in the trunk. He had been shot three times and he had been dead three days or longer. One of the bullets found in his body was fired from the same gun as the bullets found in Thomas' back yard.

Charles Thomas later told his wife that he shot Rudman three or four times in the rear seat of the latter's car. Appellant then told Thomas to take from the body a check for $4,000 which he had written for the purchase of jewelry.

On December 8, appellant gave Thomas Dr. Feld's Datsun and Thomas was to drive to Mexico, forge ownership papers, return it to Elliott who would sell it and give Thomas $1,000. Elliott later gave Mrs. Thomas Rudman's briefcase and told her to burn it; in it she found jewelry belonging to Rudman.

Thomas informed the police that Elliott had made a false report of a robbery when he claimed the loss of $360,000 worth of jewels. He told the police this after Elliott had refused to bail him out on charges he had stolen the Datsun 240Z.

In July of 1974, Elliott reported as stolen his 1973 Chevrolet Malibu and several pieces of jewelry, for which his insurance carrier compensated him with a draft for $23,125. Appellant gave the draft, ostensibly signed by his wife and him, to Eric Waller, his insurance agent, and asked for cash. Waller complied, retaining about $3,000 which covered Elliott's outstanding debts to him and paying appellant about $20,000.

Nancy Elliott, appellant's former wife, testified that several of the items allegedly stolen from Elliott in 1974 belonged to her. She signed neither the proof-of-loss statement nor the draft issued by the insurance company, although both documents bore her name. The proof-of-loss statement had been notarized by Janice Susan Nissen, appellant's secretary and girl friend.

Mrs. Elliott also testified that appellant was still driving his Chevrolet in December of 1974, several months after he reported it stolen. Although the car had been red when it was purchased, it was brown when Mrs. Elliott saw it late in 1974. Appellant repainted the car at the Laverne Autocraft Body Shop in Laverne, California, in November of 1974.

Elliott's defense consisted of three parts—first, he attempted to cast doubt on the prosecution's evidence that Ben Rudman died on November 26, 1974; second, he tried to show that he had no motive to rob Rudman because his construction company was financially solvent; third, he sought to impeach Virginia Thomas' credibility. Elliott himself did not take the stand.

## I. WAS APPELLANT PREJUDICED BY THE MANNER IN WHICH COUNT ONE (THE CONSPIRACY COUNT) WAS PLEADED?

The conspiracy count charged that Thomas, Elliott and Thompson conspired to violate three sections of the Penal Code and one section of the Insurance Code in a single conspiracy. Six overt acts were also charged. The amended information read as follows:

"COUNT ONE

"The District Attorney of the County of Santa Clara, State of California, hereby accuses JAMES THERON ELLIOTT, DANIEL TOD THOMPSON, and CHARLES LOWELL THOMAS, aka James Thomas of a felony, to-wit: a viol. of Calif. Penal Code Sec. 182 (CONSPIRACY) in that,

on or about and between Nov. 1, 1973 and Apr. 16, A.D., 1975, in the County of Santa Clara, State of California, the said defendant(s) did together with person or persons unknown, conspire, combine, confederate and agree together to commit crimes, to wit: violations of Sec. 187 of the Penal Code of the State of California; violations of Sec. 211 of the Penal Code of the State of California; violations of Sec. 484 of the Penal Code of the State of California; and violations of Sec. 556 of the Insurance Code of the State of California.

### "OVERT ACT NO. 1

"That thereafter, at and in the County of Santa Clara, State of California, and in pursuance of said conspiracy and to effect its object, the said defendant(s) CHARLES THOMAS, aka James Thomas, on or about December 3, 1973, did shoot and wound FRANK RICHARDS.

### "OVERT ACT NO. 2

"That thereafter, at and in the County of Santa Clara, State of California, and in pursuance of said conspiracy and to effect its object, the said defendant DANIEL THOMPSON, during the first week in November, 1974, did arrange and accomplish an introduction and meeting among JAMES ELLIOTT, ROBERT TORRES, and PAUL COPANSKY.

### "OVERT ACT NO. 3

"That thereafter, at and in the County of Santa Clara, State of California, and in pursuance of said conspiracy and to effect its object, the said defendant(s) CHARLES L. THOMAS, aka James Thomas, on or about the 14th day of November, 1974, did travel to San Jose and Santa Clara, California, from Chino, California.

### "OVERT ACT NO. 4

"That thereafter, at and in the County of Santa Clara, State of California, and in pursuance of said conspiracy and to effect its object, the said defendant DANIEL THOMPSON, on or about the 26th day of November, A.D. 1974, did place telephone calls from Carte Jewelers in San Jose, California to Keepsake Jewelers in Oakland, California.

### "Overt Act No. 5

"That thereafter, at and in the County of Santa Clara, State of California, and in pursuance of said conspiracy and to effect its object, the said defendant(s) DANIEL THOMPSON, on or about the 26th day of November, A.D. 1974, did arrange and accomplish a meeting among defendants DANIEL THOMPSON, JAMES ELLIOTT, and victim BEN RUDMAN.

### "Overt Act No. 6

"That thereafter, at and in the Counties of Los Angeles and San Bernardino, State of California, and in pursuance of said conspiracy and to effect its object, the said defendant CHARLES THOMAS, aka James Thomas, between December 1, 1974 and February 27, 1975, did operate and withhold from its owner a stolen Datsun automobile."

Pursuant to this count evidence of the following incidents was admitted: (1) a conspiracy between Thomas and Elliott to murder Mr. Richards so that Elliott could collect insurance money; (2) a conspiracy including Elliott, Thomas and Thompson to murder either Mr. Torres or Mr. Copansky so Elliott could collect insurance money; (3) a conspiracy including Thomas, Elliott and Thompson to murder and rob Ben Rudman so that Elliott could get Rudman's inventory of jewelry; (4) a conspiracy to steal Mr. Feld's Datsun 240Z, which eventually involved Thompson, Elliott and Thomas; (5) a conspiracy on the part of Elliott, possibly including Thompson, to fake a robbery of $360,000 worth of jewels Elliott never had, and collect the insurance; (6) a conspiracy involving Elliott, to claim that his Chevrolet Malibu and some jewelry were stolen and collect insurance money.

However, the evidence produced at the trial showed a series of different, separate conspiracies. At the time of Richards' shooting, Elliott did not know that Torres and Copansky would approach Thompson looking for someone to buy their instalment contracts; nor at the time of Richards' shooting could it be foreseen that Elliott would meet Ben Rudman and learn of the expensive inventory of jewels he carried.

The case of *Kotteakos* v. *United States* (1946) 328 U.S. 750 [90 L.Ed. 1557, 66 S.Ct. 1239] is cited by appellant as a guideline in distinguishing between single and multiple conspiracies. In *Kotteakos,* a number of different defendants arranged illegal government loans through a single

broker. Although there was a single codefendant involved in all of the transactions, the other party to the agreement was always different. The court, in rejecting the government's theory of a single overall conspiracy, noted (at pp. 754-755): "In many cases the other defendants did not have any relationship with one another. . . . [¶] [t]he proof therefore admittedly made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment."

The subsequent case of *Blumenthal* v. *United States* (1947) 332 U.S. 539, 558 [92 L.Ed. 154, 168-169, 68 S.Ct. 248] elaborated upon the meaning of *Kotteakos*. It pointed out that none of the agreements in *Kotteakos* "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. . . . There was no drawing of all together in a single, over-all comprehensive plan."

■ Applying these guidelines to this case, we see that the conspiracy charged was in reality a series of conspiracies over an extended period of time, with different actors and without any overall comprehensive plan.

We therefore conclude that it was improper to have consolidated these conspiracies into one count and the defendant's demurrer should have been sustained with leave to amend to charge separate conspiracies.

This error does not necessarily call for reversal. ■ A judgment will not be reversed on the ground that two separate conspiracies were charged as one, unless the appellant shows that he was prejudiced thereby. (*Berger* v. *United States* (1935) 295 U.S. 78 [79 L.Ed. 1314, 55 S.Ct. 629]; see also Pen. Code, § 960.)

■ Appellant next contends that since these were separate conspiracies, not connected in their commission, they should not have been joined together, and the evidence received would have been inadmissible.

Evidence of the fake robberies of the $360,000 in gems, and the reported theft of the Chevrolet Malibu would have been inadmissible. However, inclusion of the insurance frauds did not prejudice appellant in the light of the much more grievous evidence of murder by contract which involved Elliott personally, and which was clearly proven at the trial.

Mrs. Thomas' testimony was corroborated by facts such as: appellant's presence with Rudman at Carte Jewelers late on the evening of November 26; the restaurant owner's testimony that when Rudman was last seen he was in the company of men, one of whom resembled appellant; the discovery of Rudman's jewelry in his girl friend's car parked in his garage; the presence of Rudman's calculator in appellant's office; the match-up of the bullet found in Thomas' back yard with the bullet found in Rudman's car door; and, the testimony of Mr. Gilbert and Mr. Krager that appellant had offered Krager $10,000 to kill his business partner, Mr. Richards. In the face of such clear proof of murder by contract, the admission of evidence of appellant's theft and insurance fraud cannot be said to have been prejudicial error.

The theft of the Datsun would have been received in evidence in any event due to the fact that the car was given to appellant in part payment for the Rudman murder.

■ Appellant also contends that evidence of the Richards' shooting and the Torres and Copansky plot was inadmissible since they were improperly joined in the conspiracy count. These separate conspiracies could have been charged together under Penal Code section 954 as being the "same class of crimes or offenses," although as a practical matter, venue might not have been proper for some of the conspiracies. In any event, the crimes would be admissible under Evidence Code section 1101, subdivision (b)[1] to show a common plan. The common plan here indicates a planned professional killing with financial gain as the motive for the killing, with Mr. Elliott as the recipient of that gain. Thus, although the evidence was prejudicial to appellant, its probative value of showing a repeated murder for hire outweighed this prejudice.

■ Appellant contends that search of the Thomas' home on April 6, 1975, and of the automobile parked in the garage of appellant's home in Claremont was unreasonable.

[1]Evidence Code section 1101 provides in relevant part: "Evidence of character to prove conduct. (a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

## II. Propriety of Search and Seizure

### A. *Search of the Thomas' Home*

The facts adduced at the suppression hearing were that on April 6, 1975, police searched the back yard of the Thomas' home. They were searching for the bullets Mrs. Thomas claimed were test fired by appellant on November 26, 1974. One of the bullets matched a bullet found in Ben Rudman's body. At the time of the search, Thomas was in custody; Mrs. Thomas was living in an apartment. The officer who conducted the search had the consent of Mrs. Thomas and the consent of a real estate agent with whom the property was listed for sale. Besides searching with a metal detector, 15 or 20 small holes were dug.

At the time she gave consent, Mrs. Thomas and her husband had previously entered into a contract to sell their home; the escrow had not yet closed, and the new buyer had not yet occupied the residence.

Police also obtained the consent of the real estate agent because they wanted to contact whoever was in charge of the property and exercised the most control over it. The agent advised Sergeant Ralen that the new owners had not yet taken possession, and Sergeant Ralen's interpretation of that was that they did not legally own the property at that time.

It would appear that Mrs. Thomas had actual authority to give consent to the search. Since she and her husband had entered into an agreement for the sale of the home and the escrow had not closed, and absent a showing that the conditions for delivery of the deed had been satisfied, it is presumed that legal title remained in the Thomases. (*Vierneisel* v. *Rhode Island Ins. Co.* (1946) 77 Cal.App.2d 229, 231 [175 P.2d 63].)

The fact that Mr. Thomas was not consulted is not fatal. While it has been held that the wife cannot give consent where the police know that the husband objects and has instructed the wife not to permit a search (*People* v. *Fry* (1969) 271 Cal.App.2d 350 [76 Cal.Rptr. 718]), it has also been held that the police need not inquire of a consenting wife whether or not her husband has objected to the search. (*People* v. *Reynolds* (1976) 55 Cal.App.3d 357, 369-370 [127 Cal.Rptr. 561].)

In *People* v. *Hill* (1968) 69 Cal.2d 550, 554 [72 Cal.Rptr. 641, 446 P.2d 521], affirmed 401 U.S. 797 [28 L.Ed.2d 484, 91 S.Ct. 1106], the Supreme Court stated the rule regarding good faith belief of a consent to

search as follows: "Although sometimes criticized, the rule that a search is not unreasonable if made with the consent of a third party whom the police reasonably and in good faith believe has authority to consent to their search has been regularly affirmed."

Also, in *De Conti* v. *Superior Court* (1971) 18 Cal.App.3d 907, at page 910 [96 Cal.Rptr. 287], the court said " 'Policemen are not required to be experts in the law of landlord and tenant.' "

■ From a review of the entire evidence, it is concluded that the trial judge properly found that the officer had reasonably and in good faith believed that both Mrs. Thomas and the real estate agent had authority to consent to his entry on the premises. We therefore would affirm the decision of the trial court in denying the motion to suppress the bullets found on the premises.

## B. *Search of Apartment and Garage*

■ Appellant objects to the search of the car which revealed 13 diamond pendants of Rudman's inventory, on the grounds that the police had no probable cause to believe the Rudman jewelry would be found there and that the search of the car was invalid because it was not specifically authorized in the search warrant.

Respondent replies that since the warrant authorized the search of appellant's house and "appurtenant buildings" that this included the garage and therefore respondent reasons, the police had the right to search the contents of the garage, i.e., the two automobiles belonging to Janice Susan Nissen. (*People* v. *Dumas* (1973) 9 Cal.3d 871 [109 Cal.Rptr. 304, 512 P.2d 1208] is cited by both parties in support of their respective positions.)

In *Dumas,* the court held that a warrant authorizing the search of an apartment, " 'all trash cans, storage areas, garages and carports which are assigned to and/or used by occupants of the aforesaid apartment' " (*id.,* at p. 875), did not authorize search of defendant's car which was parked on the street in front of a house two lots away. The court said: "The description in a search warrant must be sufficiently definite that the officer conducting the search 'can with reasonable effort ascertain and identify the place intended.' (*Steele* v. *United States* (1925) 267 U.S. 498, 503 [69 L.Ed. 757, 760, 45 S.Ct. 414].) Nothing should be left to the discretion of the officer. (*Marron* v. *United States* (1927) 275 U.S. 192,

196 [72 L.Ed. 231, 237, 48 S.Ct. 74].) . . . [¶] While it is not necessary that a search warrant state the name of the owner or a correct license number of the automobile to be searched (*Wangrow* v. *United States* (8th Cir. 1968) 399 F.2d 106, 115, cert. den. (1968) 393 U.S. 933 [21 L.Ed.2d 270, 89 S.Ct. 292]), we conclude that a warrant supporting the search of a motor vehicle must, at the very least, include some explicit description of a particular vehicle or of a place where a vehicle is later found. (See generally Note 47 A.L.R.2d 1444.) Inasmuch as the warrant in the present case described neither the vehicle nor the site of the vehicle, it cannot serve to validate the search." (*Dumas, supra,* 9 Cal.3d at pp. 880-881.)

We have decided upon analysis of *Dumas, supra,* and the American Law Reports note cited in *Dumas,* and other authorities, that the search of the automobiles in the garage was legal; that the warrant authorized search of the cars which were later found in the garage attached to Elliott's house by describing Elliott's house and "appurtenant buildings," and that this description met the minimum standards of definiteness required for the search of an automobile.

Appellant's assertion of no probable cause cannot stand. If there was probable cause to search the house and the appurtenant areas, it follows that inspection of their contents was permissible.

The respondent's petition to file a supplemental brief on the subject of the death penalty is denied.

The judgment is modified to provide that appellant is sentenced to life imprisonment for the murder of Rudman, and to imprisonment for the term prescribed by law for the conspiracy count and the robbery count, the latter two sentences merging with and running concurrently with the life term pursuant to Penal Code section 669. The judgment is affirmed as modified.

Scott, Acting P. J., and Feinberg, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 13, 1978.