[No. B147414. Second Dist., Div. Three. Feb. 28, 2002.]

THE PEOPLE, Plaintiff and Appellant, v.
LONNIE HAGAN GALLEGOS et al., Defendants and Respondents.

614

**COUNSEL**

Steve Cooley, District Attorney, Brent Riggs and William Woods, Deputy District Attorneys, for Plaintiff and Appellant.

Law Offices of Charles T. Mathews, Charles T. Mathews, Raymond G. Ballister, Jr., and Jeffrey A. Rager for Defendant and Respondent Lonnie Hagan Gallegos.

Bruce A. Hoffman, Alternate Public Defender, and Felicia Kahn Grant, Deputy Alternate Public Defender, for Defendant and Respondent Jerry Manuel Ramirez.

**OPINION**

**ALDRICH, J.**—Pursuant to Penal Code section 1238, subdivision (a)(7),[1] the People appeal the superior court's suppression of evidence seized during a search of the home of defendants and respondents Lonnie Hagan Gallegos and his stepson, Jerry Manuel Ramirez. The People contend the trial court erred by "fail[ing] to properly apply the well-established rule that when officers executing a valid search warrant discover weapons and contraband in plain view they may seize those items, even if not denominated in the warrant." We agree with the People and reverse.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Undercover investigation of the Mongols motorcycle gang and issuance of search warrant.*

In a two-and-one-half year undercover investigation, agents of the Federal Bureau of Alcohol, Tobacco, and Firearms (ATF) investigated the Mongols motorcycle gang's suspected criminal activities, including alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.). ATF Special Agent John Ciccone prepared a 167-page affidavit in support of warrants authorizing searches of numerous residences and two businesses believed to be associated with the Mongols.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

That affidavit stated the following. The Mongols was an outlaw motorcycle gang, whose primary purpose was the proliferation and maintenance of the gang through criminal activity. Members of the gang had violated RICO and other federal statutes by engaging in criminal activities including murder, extortion, sale and possession for sale of controlled substances, interstate transportation and possession of stolen motorcycles, changing or obliterating the vehicle identification numbers of stolen motorcycles and/or motorcycle parts, using firearms in connection with violent crimes, and possession of firearms and ammunition by convicted felons. The gang was highly organized and the organization's secretary-treasurers kept records of meetings and finances.[2] Gallegos was secretary-treasurer of the El Sereno Mongols chapter.

The affidavit noted that the warrants to be issued would seek different items from different search locations. It explained that, "in many instances the individuals whose residences are being searched under this portion of the affidavit are not directly implicated in any crime" but that their residences would be searched because they were the custodians of records for Mongols chapters.[3]

Based upon the information in the affidavit, on May 11, 2000, the United States District Court for the Central District of California issued a warrant to search Gallegos's property. The warrant authorized the search of Gallegos's premises for evidence of racketeering activities and authorized the seizure of various documents related to the Mongols organization.[4]

---

[2]The affidavit explained that the Mongols organization was a "highly organized criminal enterprise, with a defined, multi-level chain of command." The gang had approximately 150 to 200 members in Southern California, and had 21 local "chapters" in various areas of the country. Each local chapter had a president, vice-president, secretary-treasurer, and sergeant at arms. A hierarchy of "national officers" also existed. The secretary-treasurers "ha[d] the most extensive record keeping functions" and were responsible for creating and maintaining minutes of the chapter's meetings, maintaining records of the chapter's bank accounts and cash funds, collecting and paying dues and fines, and forwarding dues to the national secretary-treasurer.

[3]Respondents argue, and the trial court appears to have concluded, that Gallegos fell into this category. We likewise assume arguendo that there was not probable cause to believe Gallegos had committed the enumerated offenses.

[4]The warrant read: "The following items to be seized are evidence of violations of Title 18, United States Code, Sections 2, 3, 371, 924(c), 1959, 1961 et seq. and 1962:

"a. All notes or minutes of meetings conducted by the Mongols, including any chapter(s) of the Mongols, between January 6, 1998 and the date of the search, including without limitation, the minutes of church meetings, President's meetings, National Officer meetings, Sergeant At Arms meetings, and Secretary/Treasurer meetings;

"b. All telephone lists, membership rosters, officer's lists [sic], membership applications and other records identifying officers and other members of the Mongols between January 6, 1998 and the present;

## 2. *The search.*

On May 19, 2000, Gallegos's home was searched pursuant to the warrant, revealing Mongols documents, as well as marijuana, numerous guns and ammunition, and other items. Testimony by officers at the defendants' motion to suppress the items was as follows.

Various law enforcement officers executed the warrant at approximately 6:50 a.m.[5] Using a public address system, officers ordered Gallegos, his wife, respondent Ramirez (Gallegos's stepson), and another stepson out of the residence. They were handcuffed and detained, initially on the front lawn and then on the living room couch. Los Angeles County Sheriff's Detective Tui Wright and other officers completed a quick protective sweep of the premises; no other persons were found inside. Wright spoke to Gallegos, told him officers were there to execute a search warrant, and, "for safety reasons," asked if there were any firearms inside the house. Gallegos informed Wright that a rifle, a shotgun, an assault weapon, and ammunition were located under his bed, and that other weapons were located in the garage. Subsequently, officers searched the one-story three-bedroom residence, as well as the detached garage, a truck located in the residence's driveway, and a motor home parked on the property.

---

"c. All editions of the Mongol's [*sic*] Constitution and records reflecting amendments to the Constitution;

"d. All records which reflect or relate to interstate motorcycle runs by the Mongols from January 6, 1998 to the date of this search;

"e. All records referring to the responsibilities of officers of the Mongols or any of its chapters, or of members of the Mother Chapter;

"f. All records referring to the award of a skull and bones to any member of the Mongols after January 6, 1998;

"g. All financial records, bank account records, bank statements, canceled checks, ATM records, and internal records of the Mongols reflecting activities in any bank accounts in whatever name held by or for the Mongols motorcycle club or of any cash funds held by the Mongols, its chapters or members on behalf of the Mongols from January 6, 1998 to the present . . . . [¶] . . . [¶]

"h. Indicia of ownership, occupancy, residency, or control of the premises and of the other items of evidence described above, limited to, utility bills, telephone bills, loan and mortgage payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, property tax bills, and escrow documents."

[5]Approximately 11 officers participated in the initial execution of the warrant and helped secure the premises, including two Alhambra police officers, two ATF agents, two or three officers from the Major Crimes Bureau, and several deputy sheriffs assigned to a narcotics team. Not all officers participated in the search. For example, the two Alhambra officers departed the scene after the premises were secure; some officers left during the day to obtain food; and other officers departed to book the defendants after incriminating evidence was found.

### a. *Search of Gallegos's bedroom.*

Detective Wright and his partner Robert Knudson searched Gallegos's bedroom (the master bedroom). Under the bed, Knudson found a Beretta shotgun, a Glenfield semiautomatic .22-caliber rifle, and a Norinco 84-S assault weapon with five extra magazines. Wright was present when Knudson retrieved the weapons and knew that assault weapons, such as the Norinco 84-S, were illegal. All three weapons were placed in a central location in the interest of officer safety.[6]

Wright and Knudson both searched the master bedroom closet. Knudson discovered five large green cans filled with ammunition.

One thousand, four hundred dollars in cash was recovered from the pocket of a pair of Gallegos's pants that were in the bedroom. A checkbook was found in a bedroom dresser.

The weapons were recovered from under the bed within the first 30 minutes officers were at the residence. The other items were recovered within approximately the next two hours in a more detailed search. The master bedroom was not searched completely at one time; instead, the officers searched portions of the room and later returned to complete the search of other portions of the room.

### b. *Search of Ramirez's bedroom.*

After searching Gallegos's bedroom, Wright and an ATF agent moved to respondent Ramirez's bedroom, which was messy and cluttered. A set of brass knuckles was in plain view on a table or stand next to the doorway. Wright recognized that the brass knuckles were illegal.

Wright observed a plastic Tupperware-type box, approximately 18 inches long by 10 inches wide, on the floor of the room. The top of the box was opaque plastic; the sides were translucent. Looking through the sides, Wright could see some items, but could not discern whether they were papers, as he "really couldn't see through" the box. Wright opened the box and discovered nine plastic bags of marijuana.

On the floor in plain sight was a small scale, approximately two feet away from the Tupperware box. Wright found the scale significant in that it was close to marijuana which appeared to be packaged for sale.

---

[6]Wright explained that in the interest of officer safety when executing a search warrant, his practice was to collect all firearms at the location so he could inspect, unload, and place them in a central area to assist officers in retaining control of the situation.

On the floor in the middle of the room, in plain view, was a green duffle bag, approximately three by three by two feet. Wright unzipped the bag and opened the top flap. He immediately saw an oxygen tank engraved "State of California, Department of Recreation." The engraving and at least a portion of the serial number were in view as soon as Wright opened the top flap of the bag, without the necessity for Wright to move or handle the tank. The next day, after the tank had been seized in the search, Wright used the serial number to conclusively determine that the tank was stolen; however, he had "decided it was stolen prior to making any calls" because of the engraving. Wright explained that he "suspected it might have been" stolen, but did not "form a complete opinion."

c. *Search of the truck.*

Sergeant Gloria Gressman searched a truck found in the driveway of the Gallegos residence. In the truck bed, she discovered a small white Sentry safe, approximately six inches high and one foot wide. Knudson opened the safe. It contained a loaded .44 Special Charter Arms revolver.

d. *Search of the garage.*

Gressman, Knudson, and Deputy Sheriff Steven Blagg searched the detached garage. The garage contained several display cases, which were cluttered with many items. It also contained a filing cabinet and a workbench strewn with tools, papers, and magazines.

Also in the garage, Gressman found another white Sentry safe, like the one found in the truck. Inside the safe officers found a Mongols motorcycle jacket with Mongols patches located on the breast and back;[7] a loaded .357 Magnum blue steel revolver; approximately a pound of marijuana, packaged in three separate bags; and a number of documents, including receipts related to the Mongols gang.

In plain sight in the center of the garage, resting on a glass display case, Knudson found a wooden box, approximately 14 by 12 by 5 inches, containing a revolver. Knudson found this box approximately one hour after officers' arrival at the house.

In a workbench drawer, Blagg discovered a Mossberg 12-gauge shotgun and shotgun shells; checkbooks; photographs; miscellaneous paperwork; and two electronic gram scales. Blagg found a triple beam scale on a garage shelf, and a bulletproof vest on the floor.

---

[7]At the suppression hearing, the item was variously described as a jacket or a vest.

e. *Search of the motor home.*

At approximately 11:00 a.m. or 12:00 noon, Wright and Knudson searched a motor home parked on the premises. The motor home was the last location searched.

Prior to searching the motor home, Wright spoke to Gallegos and advised him of his *Miranda*[8] rights. Gallegos told Wright that he was on probation for narcotics violations and was prohibited from owning firearms.

The officers then searched a hinged storage space located beneath a bed in the motor home. Inside they found another document safe similar to the safes found in the garage and truck bed, but larger than the others. The safe contained an Intratec .9-millimeter assault weapon with five or six magazines; a Smith and Wesson .9-millimeter pistol with magazines in a small zippered case; a Jennings .22-caliber semiautomatic pistol with a holster; ammunition; military and firearms manuals, including some that demonstrated the conversion of semiautomatic to fully automatic weapons; a clear plastic baggie of marijuana; a scale; and a box containing several hundred rounds of ammunition. Wright recognized the Intratec .9-millimeter semiautomatic assault weapon as an illegal weapon. Wright recognized the zippered case containing the Smith and Wesson pistol as an item used to hold firearms.

In plain sight in the storage space was a box containing a Norinco Mak-90 assault rifle. A periscope from the weapon protruded from the box. More ammunition, and a Maverick 12-gauge pump action shotgun, were in plain view when the officers opened the hinged top of the storage space. Wright knew that possession of the Norinco rifle would become an offense on January 2, 2001, after the expiration of a one-year grace period.

3. *Charges filed against Gallegos and Ramirez.*

As a result of the search, the People filed a 20-count information against Gallegos and Ramirez. Gallegos was charged with: two counts of possession of marijuana for sale (Health & Saf. Code, § 11359); receiving stolen property (the Smith and Wesson .357 Magnum revolver) (§ 496, subd. (a)); 12 counts of unlawful firearm activity (i.e., possession of a firearm in violation of express conditions of probation (§ 12021, subd. (d)); two counts of possession of assault weapons (§ 12280, subd. (b)); possession of a

---

[8]*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

silencer (§ 12520);[9] receiving stolen property (the "oxygen medical kit") (§ 496, subd. (a)); and possession of a deadly weapon, metal knuckles (§ 12020, subd. (a)(1)).

Ramirez was named in three counts, for possession of marijuana for sale (Health & Saf. Code, § 11359), receiving stolen property (the oxygen medical kit) (§ 496, subd. (a)), and possession of a deadly weapon, metal knuckles (§ 12020, subd. (a)(1)).

### 4. *Trial court's grant of respondents' motion to suppress.*

Gallegos and Ramirez moved to suppress all evidence seized in the search pursuant to section 1538.5.[10] The trial court ruled there was probable cause for the issuance of the search warrant, but held an evidentiary hearing to determine whether the officers properly seized items not named in the search warrant.

After hearing evidence and argument, the court granted the defense motion to suppress all items seized, other than some receipts. The court explained that there was no "general nexus between the items seized and any of the items mentioned in the search warrant" and concluded that "the search was a general exploratory search unauthorized by the search warrant. The items seized were not in legal plain view." The court summarized its reasoning as follows: "There must be some related nexus between the search, the items described in the search warrant[,] and the items recovered. [¶] Here the search was for documents by a federal department regarding an outlaw motorcycle gang. The items seized and recovered by the Sheriff's Department did not 1, pertain to that investigation, and 2, did not have [a] reasonable relationship or nexus to the items that were described in the warrant."

The court found that while officer safety was a great concern, the officers had conducted a protective sweep of the house and a patdown search of the residents; the residents had been handcuffed; and the residents were far outnumbered by law enforcement personnel. Thus, the court found, the situation did not pose an unreasonable risk of danger for the officers justifying seizure of the weapons.

As a result of the order suppressing the items seized, the People announced they were unable to proceed to trial and the trial court dismissed the

---

[9]Although the information alleged Gallegos was in possession of a silencer, no evidence was adduced at the suppression hearing regarding discovery of a silencer during the search.

[10]At the hearing on the motion, respondent Ramirez indicated he had "no objection" to the seizure of the brass knuckles.

case pursuant to section 1385. Pursuant to section 1238, subdivision (a)(7), the People appeal the trial court's order suppressing all evidence seized and the resulting dismissal of the cases.

## DISCUSSION

1. *The trial court erred by granting defendants' motion to suppress.*

 a. *Applicable legal principles.*

The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees the right to be free of unreasonable searches and seizures. (U.S. Const., 4th Amend.; *People v. Camacho* (2000) 23 Cal.4th 824, 829-830 [98 Cal.Rptr.2d 232, 3 P.3d 878].) Our review of issues related to the suppression of evidence derived from police searches and seizures is governed by federal constitutional standards. (*People v. Camacho, supra,* at p. 830; *People v. Bradford* (1997) 15 Cal.4th 1229, 1291 [65 Cal.Rptr.2d 145, 939 P.2d 259].) On review of the trial court's denial or grant of a suppression motion, we defer to the trial court's factual findings if supported by substantial evidence, but exercise our independent judgment to determine whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment. (*People v. Camacho, supra,* at p. 830; *People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]; *People v. Russell* (2000) 81 Cal.App.4th 96, 102 [96 Cal.Rptr.2d 568].)

" 'When officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as the result of the officers' efforts.' [Citation.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 563 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *Minnesota v. Dickerson* (1993) 508 U.S. 366, 374-375 [113 S.Ct. 2130, 2136-2137, 124 L.Ed.2d 334]; *Horton v. California* (1990) 496 U.S. 128, 135-137 [110 S.Ct. 2301, 2307-2308, 110 L.Ed.2d 112]; *People v. Kraft* (2000) 23 Cal.4th 978, 1041, 1043 [99 Cal.Rptr.2d 1, 5 P.3d 68].) To justify such a seizure, the officers must lawfully be in the position from which they view the item; the incriminating character of the item as contraband or evidence of a crime must be immediately apparent; and the officers must have a lawful right of access to the object. (*Horton v. California, supra,* at pp. 136-137 [110 S.Ct. at pp. 2307-2308]; *People v. Kraft, supra,* at p. 1041; *People v. Bradford, supra,* 15 Cal.4th at p. 1295.) The Fourth Amendment does not prohibit such seizure of evidence in plain view even if the discovery by the officers was

not "inadvertent." (*Horton v. California, supra,* at p. 130 [110 S.Ct. at p. 2304]; *People v. Bradford, supra,* at p. 1294.)

The incriminating nature of the item is "immediately apparent" when the police have probable cause to believe it is contraband or evidence of a crime; officers need not know, to a near certainty, that the item is evidence of a crime. (*Minnesota v. Dickerson, supra,* 508 U.S. at p. 375 [113 S.Ct. at pp. 2136-2137]; *Arizona v. Hicks* (1987) 480 U.S. 321, 326 [107 S.Ct. 1149, 1153, 94 L.Ed.2d 347]; *Texas v. Brown* (1983) 460 U.S. 730, 741-742 [103 S.Ct. 1535, 1542-1543, 75 L.Ed.2d 502] (plur. opn.); *People v. Kraft, supra,* 23 Cal.4th at p. 1043.) "[P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' [citation], that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required. [Citation.]" (*Texas v. Brown, supra,* 460 U.S. at p. 742 [103 S.Ct. at p. 1543].) "If, however, the incriminating character of an object in plain view is not immediately apparent, the plain view doctrine cannot justify its seizure. [Citations.]" (*People v. Bradford, supra,* 15 Cal.4th at p. 1295.)

### b. *Application of these principles here.*

In light of the foregoing principles, we conclude the trial court erred by suppressing the items seized on the ground there was no nexus between them and the items mentioned in the search warrant. Such a nexus is not required. Instead, the required "nexus" is that between the item discovered and a criminal activity, though not necessarily the criminal activity denominated in the warrant. *Arizona v. Hicks, supra,* 480 U.S. 321, rejected arguments that "because the officers' action directed to the stereo equipment was unrelated to the justification for their entry into respondent's apartment, it was *ipso facto* unreasonable. That lack of relationship *always* exists with regard to action validated under the 'plain view' doctrine; where action is taken for the purpose justifying the entry, invocation of the doctrine is superfluous." (*Id.* at p. 325 [107 S.Ct. at p. 1153], italics in original; *People v. Kraft, supra,* 23 Cal.4th at p. 1043 [if items not listed in warrant are seized pursuant to plain view doctrine, "it is sufficient that the investigators have probable cause to believe the item is evidence of *some* crime," and it is not necessary that the items be associated with a *particular* crime].) Thus, the requisite "nexus" necessarily exists when officers have probable cause to believe the item to be seized is contraband or evidence of a crime.

Likewise, we do not find the items must be suppressed because the search was a general, exploratory search. The trial court stated that the search was

a general exploratory search, but did not make factual findings supporting that holding. A legitimate search does not become general and exploratory merely because officers seize items not named in the warrant. (*People v. Kraft, supra,* 23 Cal.4th at p. 1043 ["the mere fact a large number of items were seized, many of which were not listed in the warrant, does not establish that the search was an illegal general search"]; *People v. Bradford, supra,* 15 Cal.4th at p. 1296; *People v. Diaz, supra,* 3 Cal.4th at p. 563.) Here, the record does not suggest that officers searched areas unlikely to contain documents, or randomly seized items.

Even assuming arguendo that the search was overbroad in some respects, suppression of all items recovered is not required, at least not unless the officers flagrantly disregarded the scope of the warrant. In *Waller v. Georgia* (1984) 467 U.S. 39, 43-44, footnote 3 [104 S.Ct. 2210, 2213-2214, 81 L.Ed.2d 31], the petitioners argued that the police had flagrantly disregarded the scope of search warrants, and urged that the officers' actions required suppression of *all* fruits of the search, rather than suppression of only those items as to which there was no probable cause to support the seizure. (*Id.* at p. 44, fn. 3 [104 S.Ct. at p. 2214], italics added.) The high court disagreed, finding that there was no allegation the officers had exceeded the scope of the warrant in the places searched, and that if the items seized without probable cause were suppressed, "there is certainly no requirement that lawfully seized evidence be suppressed as well. [Citations.]" (*Ibid.*) The California Supreme Court has noted that a majority of federal circuits recognize the remedy of blanket suppression in sufficiently egregious cases, but has declined to rule on the issue. (*People v. Kraft, supra,* 23 Cal.4th at p. 1044; *People v. Bradford, supra,* 15 Cal.4th at pp. 1304-1307.)

Assuming blanket suppression is required when officers flagrantly disregard a warrant, such a remedy is not required here. The trial court did not find—and there was no substantial evidence—that the officers acted "in flagrant disregard" of the terms of the warrant. As noted, the record does not suggest that officers searched areas unlikely to contain documents, made statements suggesting they intended to engage in an improper search, or otherwise disregarded the warrant. (*People v. Bradford, supra,* 15 Cal.4th at pp. 1306-1307 [officers did not act in flagrant disregard, despite their seizure of items that clearly fell outside scope of warrant, search of areas not named in warrant, and remarks indicating a "broader purpose" than that delineated in warrant].)

Respondent Gallegos contends the search was general and exploratory because: (1) the search took seven hours; (2) Deputy Blagg, one of the searching officers, believed that he was to look for "any type of paperwork

*or paraphernalia* relating to criminal activity of the Mongol's [*sic*] motorcycle gang," (italics added), whereas the warrant specified documents only; and (3) Gallegos's bedroom was searched three times. We disagree that these facts are sufficient to prove the officers acted in flagrant disregard of the warrant. First, while the search lasted approximately seven hours, this was not necessarily unreasonable given that officers searched the residence, truck, garage, and motor home. It goes without saying that the review of even a box of documents can take substantial time; here, the ATF agents reviewed "piles" of papers. Moreover, the garage was cluttered, making a search more time consuming. Second, assuming Blagg's testimony indicated a less-than-precise understanding of the items sought, there was no evidence Blagg engaged in a search of improper areas of the premises. Finally, Wright explained that the bedroom "was never searched completely at one time. I would say the search started in one area and then eventually we completed the search of the bedroom." ██ ██ Thus, his testimony showed that the bedroom was completely searched once, but in three different segments.[11]

c. *The items were properly seized under the plain view doctrine.*

 We next consider whether, in regard to each item seized, the requirements of the plain view doctrine were met.

Initially, we note that respondents do not challenge the propriety of the officers' search of the motor home, truck, and detached garage, as they were all on the premises. " '[A] warrant to search "premises" located at a particular address is sufficient to support the search of outbuildings and appurtenances in addition to a main building when the various places searched are part of a single integral unit. [Citations.]' [Citations.]" (*People v. Smith* (1994) 21 Cal.App.4th 942, 950 [26 Cal.Rptr.2d 580]; *People v. Minder* (1996) 46 Cal.App.4th 1784, 1788-1789 [54 Cal.Rptr.2d 555]; *People v. Elliott* (1978) 77 Cal.App.3d 673, 688-689 [144 Cal.Rptr. 137]

---

[11]We likewise reject respondent Gallegos's contention that the items were improperly seized because their discovery was not inadvertent, i.e., because officers may have hoped or expected to find contraband not described in the warrant. In *Horton v. California, supra,* 496 U.S. 128, the United States Supreme Court rejected such arguments and held that "inadvertence" is not a prerequisite to seizure under the plain view doctrine. (*Id.* at p. 130 [110 S.Ct. at p. 2304].) "The fact that an officer is interested in an item of evidence [not listed in a warrant] and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." (*Id.* at p. 138 [110 S.Ct. at p. 2309].) Article I, section 28, subdivision (d) of the California Constitution requires that our review of issues related to the suppression of evidence obtained during police searches and seizures must be governed by federal constitutional standards. (*People v. Bradford, supra,* 15 Cal.4th at p. 1291.) Thus, California cases predating *Horton* and imposing the "inadvertence" requirement lack vitality.

[warrant authorizing search of house and appurtenant buildings authorized search of cars found in garage].) ██ Here, the warrant stated, "[t]he premises to be searched is 312 S. Marguerita Avenue, Alhambra, California." It described the house, porch, driveway, and garage. Thus, the premises to be searched included the motor home, truck, and garage.

Because the warrant authorized a search for documents, the officers could properly search anywhere documents might reasonably be found. Documents may be stored in many areas of a home, car, motor home or garage. It is not unusual for documents to be stored in drawers or closets, on shelves, in containers, including the Tupperware and wooden boxes searched here, or even in duffle bags. Safes are often used precisely for the purpose of storing documents. Likewise, the storage area of a motor home could logically have been used to store documents. The documents sought included receipts, envelopes, and canceled checks, all of which are relatively small. The areas searched were, without exception, large enough to contain such documents. The officers did not seek an elephant in a breadbox, but limited their search to areas that reasonably might have contained the documents specified in the warrant. (*People v. Diaz, supra,* 3 Cal.4th at pp. 562-563 [where warrant authorized police to search for notes, memoranda, and other documents, officers properly "looked in places where they might expect to find the documents listed in the search warrant in the event defendant had attempted to hide them or throw them away; those places included trash receptacles and a bedroom closet"]; *People v. Kraft, supra,* 23 Cal.4th at p. 1043 [search beneath car floor mats for photographs did not violate Fourth Amend., as officers "merely looked in a spot where the specified evidence of crime plausibly could be found, even if it was not a place where photographs normally are stored"]; *Skelton v. Superior Court* (1969) 1 Cal.3d 144, 158 [81 Cal.Rptr. 613, 460 P.2d 485] [where warrant authorized search for small items, officers had authority "to conduct an intensive search of the entire house, looking into any places where they might reasonably expect such items to be hidden"].) Thus, we find the search did not exceed that authorized by the warrant.

(i) *Marijuana, brass knuckles, and assault weapons.*

It is clear that the marijuana, brass knuckles, and Norinco 84-S and Intratec .9-millimeter assault weapons were immediately identifiable as contraband, and Wright testified he recognized them as such. (Pen. Code, § 12020, subd. (a)(1) [making possession of metal knuckles an offense]; Health & Saf. Code, §§ 11357, 11359 [possession of marijuana, or possession for sale, is offense]; Pen. Code, § 12280, subd. (b) [making possession of assault weapon an offense].) The brass knuckles were in plain view on a

table; the assault weapons were found in plain view under the bed and in a safe in the motor home storage area. Thus, these items were properly seized.[12]

(ii) *Oxygen tank.*

Likewise, the officers had probable cause to find the oxygen tank was stolen property, as it bore the engraved inscription "State of California." The tank was found in a messy bedroom, near brass knuckles and marijuana. The circumstances did not suggest Ramirez possessed the tank legitimately for professional reasons. As noted, the officer could properly search the duffle bag because it reasonably could have contained documents. The officer did not need to manipulate or move the tank or check its serial number before concluding it was likely evidence of a crime. (Cf. *Arizona v. Hicks, supra,* 480 U.S. at pp. 326-328 [107 S.Ct. at pp. 1153-1154] [where state conceded that officer did not have probable cause to believe stereo equipment was stolen until he moved stereo, copied serial numbers, and telephoned serial numbers into headquarters, plain view doctrine was inapplicable].) While the officer here testified both that he had concluded the tank was probably stolen, and that he "suspected it might have been" stolen, but did not "form a complete opinion," complete certainty that the tank was stolen was not required to allow seizure. ■ In any event, the determination of whether a Fourth Amendment violation has occurred hinges upon an objective assessment of the officer's actions in light of the circumstances at the time of the search, not upon an assessment of the officer's actual state of mind. (*Maryland v. Macon* (1985) 472 U.S. 463, 470-471 [105 S.Ct. 2778, 2782-2783, 86 L.Ed.2d 370]; *People v. Hull* (1995) 34 Cal.App.4th 1448, 1454-1456 [41 Cal.Rptr.2d 99]; cf. *Whren v. United States* (1996) 517 U.S. 806, 813 [116 S.Ct. 1769, 1774, 135 L.Ed.2d 89] ["Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."].)

(iii) *Mongols jacket.*

■ The Mongols jacket was found in one of the safes, in plain view when the safe was opened. The warrant specifically authorized seizure of "records identifying officers and other members of the Mongols between January 6, 1998, and the present." The jacket, which bore Mongols patches, fell within this definition, as it was a record—albeit not a document—from which it could reasonably be inferred that its owner was a Mongols member. Thus, this item was specified in the warrant and was properly seized.

(iv) *Other firearms, bulletproof vest, and scale.*

Unlike the Norinco 84-S and Intratec assault weapons, the other firearms, the bulletproof vest, and the scale discovered in Ramirez's bedroom were

---

[12]On appeal Ramirez concedes that, assuming the brass knuckles were in plain view on the table as described by Wright, they were properly seized under the plain view doctrine.

not per se illegal. ■■■ ■■ ■■ Thus, seizure of these items was justified only if it was immediately apparent that the items were evidence of crime.[13] We find this requirement was met.

---

[13]Gallegos points out that the superior court found the seizure of the weapons was not justified as a safety measure. We note that, while the three weapons found under the bed were initially retrieved and moved by officers due to safety concerns, the weapons were ultimately seized as evidence of criminal activity. As we have explained, the assault weapon found beneath the bed was immediately recognizable as contraband and thus was properly seized. The other two guns discovered under the bed were apparently moved before officers discovered the marijuana, or learned Gallegos was prohibited from owning firearms. To the extent Gallegos intends to argue that the officers' temporary seizure of these weapons violated the Fourth Amendment because, at the time of discovery, it was not "immediately apparent" that they were contraband, we disagree. Courts have found similar temporary seizures of weapons during a search did not violate the Fourth Amendment. For example, in *United States v. Malachesen* (8th Cir. 1979) 597 F.2d 1232, 1234-1235, officers searched the defendant's residence pursuant to a warrant. The defendant's roommate was present, but the defendant was not. After an officer discovered a loaded revolver beneath a mattress, he picked it up, unloaded it, and delivered it to an inventory officer, who retained it during the search. The Eighth Circuit Court of Appeals found the temporary seizure reasonable. "Although the incriminating nature of the handgun may not have been immediately apparent to the investigating officers, its temporary seizure, unloading, and retention by a responsible officer . . . seems a reasonable precaution to assure the safety of all persons on the premises during the search. [Citation.] A loaded, cocked handgun poses a threat to anyone within its range of fire. Moreover, temporary seizure undercuts the chance of mishap—the accidental discharge of the handgun through mishandling by someone on the premises, or even its intentional use by [defendant's] roommate or a cohort. Common sense dictates that the weapon should be unloaded and, at least temporarily, kept in a safe place." (*Ibid.*, fns. omitted.) Other decisions are in accord. (E.g. *United States v. Humphrey* (9th Cir. 1985) 759 F.2d 743, 748 [once Coast Guard officers who boarded a ship learned there were firearms below deck, a limited, protective search for and temporary seizure of the guns was justified by security considerations]; *U.S. v. Miles* (D.Kan. 1999) 82 F.Supp.2d 1201, 1209 [once lawfully inside apartment, officers "were free to seize, at least momentarily for their safety and the safety of others in the area, the firearm which was in plain view"].)

Here, as in these cases, we do not find the officers' temporary movement of the guns to a central location violated Gallegos's Fourth Amendment rights. "A seizure occurs when 'there is some meaningful interference with an individual's possessory interests' in the property seized." (*Maryland v. Macon, supra,* 472 U.S. at p. 469 [105 S.Ct. at p. 2782]; *Arizona v. Hicks, supra,* 480 U.S. at p. 324 [107 S.Ct. at p. 1152].) As our Supreme Court has recently reiterated, "[d]ifferent interests are implicated by a search than by a seizure [citation], and a seizure is 'generally less intrusive' than a search. [Citations.]" (*In re Randy G.* (2001) 26 Cal.4th 556, 567 [110 Cal.Rptr.2d 516, 28 P.3d 239].) To assess the reasonableness of official conduct under the Fourth Amendment, we must focus upon the governmental interests justifying the seizure, and balance them against the invasion that the seizure entails. (*Id.* at p. 566.) It cannot be denied that the interest in officer safety is a legitimate and important factor in Fourth Amendment analysis. (*People v. Hart* (1999) 74 Cal.App.4th 479, 490 [86 Cal.Rptr.2d 762]). Here, the officers were lawfully on Gallegos's property. The temporary movement of the guns to a central location within the home was a reasonable, de minimis intrusion on Gallegos's property rights. On balance, we find the initial, temporary seizure of the guns was not unreasonable within the meaning of the Fourth Amendment.

First, the officers had probable cause to believe the guns were evidence of criminal activity. The officers were investigating a known member and officer of the Mongols, an outlaw motorcycle gang known to engage in narcotics violations. Upon searching the premises, officers discovered marijuana in three locations, some of it packaged as if for sale, as well as illegal firearms and brass knuckles, a large sum of cash, and several scales. Upon these facts, the officers had probable cause to believe that Gallegos was engaged in a drug sale operation, and that the firearms, scale, and bulletproof vest were evidence of that operation. It is common knowledge that drug dealers typically use firearms and ammunition in the course of their drug sale operations. "Drug dealers are known to keep guns to protect not only themselves, but also their drugs and drug proceeds; ready access to a gun is often crucial to a drug dealer's commercial success. For this reason, a jury may properly infer that a firearm kept in close proximity to illegal drugs in a place frequented by the defendant during a possessory drug offense was available for the defendant's use in furtherance of the drug possession." (*People v. Bland* (1995) 10 Cal.4th 991, 1005 [43 Cal.Rptr.2d 77, 898 P.2d 391]; see also *People v. Glaser, supra,* 11 Cal.4th at p. 367 [firearms are " 'tools of the trade' " in narcotics business]; *People v. Bradford* (1995) 38 Cal.App.4th 1733, 1739 [45 Cal.Rptr.2d 757] ["[I]t is common knowledge that perpetrators of narcotics offenses keep weapons available to guard their contraband"].) Under these circumstances, the Fourth Amendment does not require officers to shut their eyes in the face of an arsenal. Likewise, it is readily apparent that a scale, found two feet from marijuana packaged as if for sale, is likely a tool used in the drug operation. (*U.S. v. Carrasco* (9th Cir. 2001) 257 F.3d 1045, 1048 [scales are "well-known tools for the packaging and sale of drugs"].)

Second, during the search, Gallegos voluntarily revealed that he was on probation and was prohibited from owning firearms. At this point, it would have become apparent to officers that Gallegos's possession of any firearms was prohibited and was evidence of a crime. Gallegos admits that "[the] plain view doctrine can justify the seizure of any item for which the illicit nature became apparent during the course of the search for documents." He cites no authority persuading us that officers are prohibited from relying upon statements made by an individual during the course of a search, to establish probable cause to believe items viewed during the search are evidence of crime. We conclude that, after officers learned Gallegos was prohibited from owning firearms, they properly seized the firearms as evidence of an offense. (E.g., *United States v. Malachesen, supra,* 597 F.2d at p. 1235 [weapon which had been temporarily seized as safety measure, was properly seized as contraband once searching officers learned that defendant

had prior felony conviction].) Thus, the officers were justified in seizing the firearms.[14]

DISPOSITION

The trial court's order suppressing the marijuana, assault weapons, scale, firearms, Mongols jacket, brass knuckles, oxygen tank, and bulletproof vest discovered in the search is reversed.

Klein, P. J., and Kitching, J., concurred.

---

[14]The People's briefing does not address the suppression of the additional scales, cash, ammunition, military and firearms manuals, and checkbook. Accordingly, we assume the People do not intend to challenge the trial court's suppression of these items and we do not address the issue of their suppression here.